# RUTH G. NEPOM *v.* DEPARTMENT OF REVENUE

Eugene E. Feltz, Casey, Palmer & Feltz, Portland, represented plaintiff.

Glen V. Sorensen, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered September 23, 1971.

CARLISLE B. ROBERTS, Judge.

In case No. 503, the plaintiff appeals from the Department of Revenue's Order No. VL 70-80, dated March 12, 1970, and in case No. 561 she appeals from the department's Order No. VL 71-31, dated January 20, 1971. The two appeals have been consolidated for purposes of trial. The question presented was the true cash value on January 1, 1969, and on January 1, 1970, of improved real property, located in the City of Portland, described as Blocks 31 and 42, Sullivan's Addition to East Portland, further identified in the records of Multnomah County's Department of Assessment and Taxation as Account No. 1-80610-2200 and Account No. 1-80610-3060.

The two city blocks are each 200 by 200 feet, totaling 80,000 square feet. They are improved with 44 apartment units, built in the form of 11 fourplexes. The improvements were constructed in 1923 and, as of January 1, 1969, were in need of repairs and rehabilitation because of dry rot in foundations and window sills, water stains on interior walls and leaking gutters. In the course of the year 1969, major repairs were made at the cost of $16,256 and capital expenditures in excess of $12,000 were made to replace roofs and windows. In both years, the assessor found a total true cash value for the land and improvements of $270,500, and this valuation was sustained by the county board of equalization and the Department of Revenue. For both years, the plaintiff has pleaded that the value should not exceed $150,000.

At the trial, plaintiff's son, the manager of the subject property, testified as to rental income and expenses for the years 1967, 1968 and 1969. Using these figures, the plaintiff's nephew, a realtor and broker who operates his own business and who has engaged in the appraisal and sale of real estate since 1954, utilized the income approach to valuation with a capitalization rate of 11 percent and testified that the subject property should be given a true cash value of $200,000 as of January 1, 1969, and $207,000 as of January 1, 1970.

The Department of Revenue's regulation, R308.205-(A) (2), indicates that the market data, cost and income approaches to value can be used in combination or singly in making an estimate of market value, depending upon the circumstances. In some situations, the income approach is the only practical one. *Multnomah County v. Dept. of Rev.*, 4 OTR 383, 393 (1971).

It can be convincing if adequate testimony is produced as to:

1. The current annual income of the property being appraised, preferably over a period of five years.
2. The annual recurring expenses of the property being appraised, preferably over a period of five years.
3. The "going" unit rentals received from like or similar use units in comparable properties; that is, rental per square foot per month or per year for apartments, office space, and so forth.
4. The typical expenses of comparable local properties, such as property management, fire and other insurance, maintenance and repair.
5. Any sales of properties in the area comparable as to land, use, size, shape, condition, annual income, and actual sales price.
6. The current local financing conditions, percentages of loans to market value, interest rates on mortgages, and discounts required on mortgage paper.

See Friedman, ed, *Encyclopedia of Real Estate Appraising* 36, ch 3 (Rev ed, 1970).

The plaintiff brought evidence before the court concerning the first two items only. Moreover, plaintiff's appraiser based his land valuation figure of $200,000 for 1969 on a $2.50 per square foot basis (perhaps depending on the assessor's first appraisal report, Plaintiff's Exhibit 6), without proof of sales of properties in the area comparable as to land, use, size, etc., as required by item 5. He then multiplied the land valuation figure of $200,000 by 11 percent to arrive at an income figure for the land, without the improvements, of $22,000. This left him with only $93 (after subtracting $22,000 from the total average in-

come figure, less annual expenses) to capitalize for the improvements. The plaintiff's appraiser then capitalized the $93 at a 17 percent plus figure to arrive at a $530 valuation for the land improvements, consisting of 44 rental units. His calculations for the tax year 1970 were similar and resulted in a somewhat higher valuation of $207,000 for land and improvements.

In preparation for the hearing before the board of equalization with respect to the January 1, 1969, value, appraisers in the county assessor's office placed a total value on the land of $200,000 and on the improvements of $70,500, using an income approach, with a capitalization rate of 15 percent. This approach had been bolstered by comparisons of annual gross income in allegedly similar apartment house properties which had been sold during the year 1968. In this report, the market value of the land was found to be $2.50 per square foot. However, at the trial, the one witness testifying for the defendant (a supervisor of appraisals with 25 years of experience in real estate appraisals for the county), corroborated the value found by his colleagues in their report to the board of equalization (Plaintiff's Exhibit 6), but he relied wholly on sales of allegedly similar properties and placed virtually the whole value in the land itself, at $3.37 per square foot which, in his opinion, represented "the lower range of value." The market data approach is to be preferred over others where actual comparable sales figures exist. *Portland Canning Co. v. Tax Com.*, 241 Or 109, 404 P2d 236 (1965).

The reexamination by defendant's witness of the subject property in preparation for trial had convinced him that the neighborhood was (and is) in a

state of transition, with the old personal residences, multiple dwellings and apartment houses being supplanted by buildings designed for mercantile distributorships or personal service activities. It was his belief that an investor would not purchase the subject property with the expectation of continuing to operate the apartment houses. While the income from the apartments would be given consideration, as a hedge against a waiting period before development of a higher and better use, no investor would expect to base his bid for the property on the present apartment house rental income. The investor would expect to write-off the improvements as an income tax credit. The ultimate land use and the appreciation of the land would be the basis for his investment. The plaintiff's witness, in rebuttal, stated:

> "If we have an apartment for sale, you can really only sell it for income unless the person is buying that for the specific reason of tearing it down and developing it for his own use as an industrial piece of property."

After considering the testimony, the court concludes that the two expert witnesses disagreed chiefly because the plaintiff's witness assumed the apartment house operation as the highest and best use for the property and the defendant's expert witness was convinced that the area was in a state of transition to a higher and better use other than multiple dwellings and that the 46-year old buildings on the property (although refurbished prior to the 1970 assessment year) would be a subject of secondary interest, at best, to a prospective investor. Both witnesses agreed that chief appraisal emphasis should be placed upon the true cash value of the land only.

This difference in views resulted in the use of different appraisal techniques and different values.

The fact that the defendant's witness changed the appraisal approach from that used before the county board of equalization is not significant; the proceedings before the Oregon Tax Court are treated as "original, independent proceedings and shall be tried without a jury and de novo." ORS 305.425.

The testimony offered in this suit was not always coherent and the record made by each party is less than adequate. Nevertheless, the court finds that the evidence preponderates in favor of the defendant, that the area was in a state of transition, that an investor would purchase the property only with the expectation of an interim use for the apartments, and that the value to the buyer would be chiefly in the land. Recent comparable sales in the area indicated that similar land would sell for $3.35 or $3.50, up to $4 per square foot during the years in question. The defendant placed a value on the subject property of $3.37 per square foot. The property is not over-assessed.

While the evidence was insufficient to permit the court to make a proper allocation of the value between the land and the buildings, it finds from a preponderance of the evidence that the total true cash value for land and buildings, for January 1, 1969, and for January 1, 1970, was not less than the $270,500 found by the defendant. The defendant's Order No. VL 70-80 and Order No. VL 71-31 are sustained.