W. H. SHIELDS, H. A. ANDERSEN, JOSEPH
FOUGHT, EUGENE H. SILKE and ALLAN
PENNEY, co-partners doing business as VALLEY
RIVER CENTER *v.* DEPARTMENT
OF REVENUE

Plaintiffs appeared by and through Vernon D. Gleaves, Butler, Husk & Gleaves, Eugene.

Defendant appeared by and through Alfred B. Thomas, Assistant Attorney General, Salem.

Decision for plaintiffs rendered December 27, 1972.

CARLISLE B. ROBERTS, Judge.

Plaintiffs appeal from the defendant's Order No. VL 72-14, dated January 20, 1972. The issue is the true cash value as of January 1, 1970, of the plaintiffs' shopping center, exclusive of the land (the true cash value of which is agreed to be $487,500). Involved in the ultimate question is the problem of taxation of tenants' improvements, constructed or installed pursuant to "shell and allowance" leases.

Plaintiffs are copartners doing business under the assumed business name of Valley River Center. Valley River Center is a regional shopping center in Eugene, Oregon.

As of the assessment date, 29 of the stores which had been leased by plaintiffs were of a type in which the landlord constructed only the building shell, the tenant completed construction of the entire interior of the premises, and the landlord paid to the tenant a specific dollar allowance in partial reimbursement of the tenant for its expenditures in completing the interior of the store. This type of lease is referred to as a "shell and allowance" lease. Twenty-two other leases had been entered into under the terms of which plaintiffs completed both the shell and the interior of the store and delivered the premises ready for the tenant's trade fixtures.

The Director of the Department of Assessment and Taxation of Lane County, using an income approach to value, placed the center on the assessment roll with a total valuation of $6,409,830; $487,500 was allocated to the land and $5,922,330 was allocated to the improvements. Following this assessment, plaintiffs filed with the Lane County Board of Equalization a petition to reduce the assessed value to $3,860,000, a reduction of

$2,062,330. The plaintiffs also petitioned that the tenants' improvements beyond those paid for by plaintiffs be assessed to the tenants as owners thereof.

After a hearing, the board sustained the assessed valuation and, on appeal, it was affirmed by the defendant Department of Revenue.

Friedman, ed, *Encyclopedia of Real Estate Appraising,* at 402, defines and classifies shopping centers:

"A shopping center may be loosely defined as a group of retail stores under a single or limited ownership, managed as a unit and providing off-street parking. Such a definition includes the small local convenience or neighborhood center, the medium-sized community shopping center, and the large regional suburban shopping center.

"The *convenience center* may consist merely of a supermarket, drug store, variety store, beauty and barber shops, cleaners, and a few other service shops. The *community center* is generally built around a junior department store or variety store. The large *regional center* may have as many as 100 stores centered around one or more large leading department stores.

"A more detailed definition of a shopping center has been formulated by the Community Builders' Council of the Urban Land Institute as follows:

" 'A shopping center is a group of commercial establishments, planned, developed, owned, and managed as a unit, with off-street parking provided on the property (in direct ratio to the building area) and related in location, size (gross floor area), and type of shops to the trade area that the unit serves—generally in an outlying or suburban territory.' "

In considering approaches to value, both parties agree that no sales of comparable properties are avail-

able. The assessor relied on the income approach and the plaintiffs, contending that income was far from stabilized, used the cost approach. Defendant contends that the cost approach to value, using all of plaintiffs' costs in constructing the shopping center, should be given little if any weight in determining the true cash value of plaintiffs' property.

Plaintiffs contend that no addition to value should be made, regardless of which appraisal technique is employed, for amounts expended on store improvements in excess of the plaintiffs' costs for the reason that these improvements add nothing to the value of the real property as it existed on the assessment date. In the alternative, plaintiffs argue that under the terms and provisions of the leases in existence on the assessment date, and under the applicable provisions of Oregon law, these improvements were owned by the respective tenants and not the plaintiffs and, consequently, can be properly assessed only to the tenants.

As to the improvements constructed at tenants' expense, defendant argues that the improvements are tangible real property subject to assessment and taxation. Defendant further contends that these improvements are in fact plaintiffs' property and not the property of the tenants of the shopping center. Therefore, since these improvements are real property, subject to assessment and taxation, and are owned by plaintiffs, defendant argues that the improvements have been properly assessed to the plaintiffs.

The court must answer two questions: (1) Is the cost approach to market value or the income approach to market value the proper method of valuation in this case? (2) Are the tenants' improvements, represented by expenditures over and above the plaintiffs' allowances, assessable to plaintiffs or to the tenants?

The true cash value of the property must be established as of January 1, 1970, pursuant to ORS 308.210, in accordance with the Department of Revenue Regulation R308.205-(A). The uncontradicted testimony shows that Valley River Center, on January 1, 1970, was a regional shopping center with an enclosed mall, situated on approximately 17 acres of land in Lane County, Oregon; that the first shopping center stores opened in August 1969 and others opened between that date and December 31, 1969; that the Meier & Frank store situated at the southerly end of the shopping center complex opened in August 1969 and the J. C. Penney store located on the northerly portion of the shopping center complex opened in January 1970; that a considerable amount of space owned by the plaintiffs was not leased on January 1, 1970, although a nationally known leasing agent had been seeking leases for all space owned by plaintiffs since September 1, 1967; that no other regional shopping center existed on January 1, 1970, in an area as small as the Eugene-Springfield metropolitan area; that economic conditions were depressed in the area; that lending rates were at an all-time high; that no comparable sales of similar properties were available for comparison purposes in making an appraisal; that no proven income or expense figures were available for the Valley River Center and the only proved figures available on January 1, 1970, were the actual costs and expenses incurred by the plaintiffs in the construction of the improvements as the same existed on January 1, 1970, plus the operating and expense figures for the last four months of the year 1969 during which the center had been in operation.

The experienced appraiser who testified on behalf of defendant relied wholly on the income approach.

The difficulties he experienced in so doing are easily understood because, under the facts of this case, it is clear that the choice of method was grossly premature.

█ The court finds helpful and persuasive the text of Friedman, ed, *supra,* at 410-411:

"After the shopping center has been constructed and in operation for two or three years, it has a record of experience in' which rents on minimum guarantees are known facts as well as rents on percentage leases based on actual sales of the stores for the first two years, and facts on actual construction costs, interest and amortization on mortgages, and operating expenses. The appraisal can now be made on the basis of the total rental income, including overages on percentage leases and rentals on minimum guarantees. * * *"

This need for experience was also emphasized by the expert appraiser for the plaintiffs, based on an extensive knowledge of shopping centers (which, in the case of the regional suburban shopping center, involve unique aspects of property valuation. See Friedman, ed, *supra,* at 402, et seq.) The property improvements could not sell on the market for amounts greater than construction costs because "it [the center] had not proven itself."

█ The income approach (an extremely useful tool in the proper situation) requires substantial amounts of particularized, verified data. Gross errors can result if such data are not available. *Feves v. Dept. of Revenue,* 4 OTR 302 (1971); *Nepom v. Dept. of Revenue,* 4 OTR 531 (1971). It was impossible for the defendant to obtain the necessary information on which to base an income approach at the required time for assessment purposes in this instance. Since the Valley River Center was unique, the assessor could not ob-

tain data of economic rentals through other local sources, as was possible in the case of *Multnomah County v. Dept. of Rev.*, 4 OTR 383 (1971), which involved a newly constructed high-rise apartment complex. The use of averages of data found in "The Dollars and Cents of Shopping Centers, 1969," referred to by both sides, is not to be relied on if better data can be found.

The plaintiffs' testimony as to its construction costs was detailed and accurate. The testimony of the witnesses completely overcame the suggestion of the defendant that, since one partner supplied the steel used for construction and another did the construction work and was paid to supervise it, these transactions could not be considered as "arm's length" and representative of the market. The plaintiffs had carefully segregated from their construction costs as of January 1, 1970, those which were applicable to work done after that date.

The court finds that the most acceptable approach to value in these circumstances is the cost approach, used by the plaintiffs. The preponderance of the evidence supports a value for the improvements of $3,751,736, as of January 1, 1970.

The second issue presented was the tax treatment to be accorded to those improvements made by or on behalf of tenants and which were in existence on January 1, 1970. The statement of facts offered by the plaintiffs is substantially adopted by the court. As established by the evidence, each tenant occupying space in Valley River Center on January 1, 1970, had entered into a form of lease for a substantial period of years, with each lease containing basically the same "Specific Lease Provisions" and "General Lease Pro-

visions." In each lease form, a section was incorporated (identified as "Exhibit D" in the lease) which contained construction specifications. An example of the original "Exhibit D" with standard specifications for purposes of construction is found in Plaintiffs' Exhibit 9. The testimony indicated that this basic lease form was prepared at a time when the plaintiffs anticipated offering their tenants only a "turnkey" lease. However, it developed that many of the lessees wished to finish their leased space with varying specifications and a special "Exhibit D" was prepared for such leases, designated as the "shell-and-allowance" type in which the landlords constructed the shell of the building and then, on behalf of the tenant (or with the use of tenant's contractors), the space was finished according to specifications. An examination of a revised "Exhibit D" in a shell-and-allowance type lease in Plaintiffs' Exhibit 8 shows that the tenant could take responsibility for substantial aspects of construction; e.g., preparing designs (subject to minimum standards required by the plaintiffs); relating to mechanical aspects (plumbing, heating and ventilating, air-conditioning, the fire protection system and tenant's roof equipment); installing electrical equipment of all kinds; building storefronts, ceilings, service exit doors, and structural and roof openings; painting; installing hardware. Division 4 of the modified "Exhibit D" of the lease, entitled "Tenant's Work—Within Tenant's Demised Premises," §§ E, 6, provided:

> "All of Tenant's work in the demised premises as contemplated by this Division 4, shall be deemed to be the personal property of Tenant irrespective that such work becomes affixed and/or attached to the demised premises."

Article I of the "General Lease Provisions," at

pages 1 and 2 (Pl Ex 8), provides for acceptance and surrender of the premises and abandonment thereof. It has been argued that the description of "Tenant's property" therein is a narrow one, relating only to signs, movable trade fixtures and equipment, but it must be observed that this provision also contains the sentence: "In the event Tenant shall fail to remove any of Tenant's Property, floor coverings, lighting fixtures and *other items Tenant has affixed to the Premises * * *."* (Emphasis added.) This, read in connection with the provisions in modified "Exhibit D" of Plaintiffs' Exhibit 8, §§ E, 6, with the reference to "All of Tenant's work * * *" sufficiently shows the intention of the lessors and lessee that tenant's additions, beyond the amount provided for by the landlords' allowances, are to remain the property of the tenant, title to be divested only in the case of abandonment. Property separation by ownership for tax purposes is clearly contemplated by subsection (2) of ORS 308.115, in very specific language:

> "Similarly, whenever any building, structure, improvement, machinery, equipment or fixture is owned separately and apart from the land or real property whereon it stands or to which it is affixed, such building, structure, improvement, machinery, equipment or fixture shall be assessed and taxed in the name of the owner thereof."

The burden put upon the assesor is not an impossible one in the present instance, inasmuch as the specifications within the leases and the various writings required in consequence of the lease provisions will give him the information which he requires to make his appraisal.

The court agrees with the defendant that the improvements constructed at tenants' expense are

tangible real property, subject to assessment and taxation, but finds that they should be assessed to the respective tenant owners and not to the plaintiffs herein. The question of the value of such property is, consequently, not within the purview of the present case.

The court finds, by a preponderance of the evidence, that the true cash value of plaintiffs' improvements which are the subject of this case, as of January 1, 1970, was $3,751,736, and that the value of the tenants' improvements is assessable in the names of the tenants as owners.

The Director of the Department of Assessment and Taxation of Lane County is directed to amend the assessment and tax rolls for 1970-1971 accordingly and the County Commissioners of Lane County, Oregon, are directed to refund to plaintiffs any taxes paid for tax year 1970-1971, on any value of the improvements in excess of $3,751,736, with statutory interest, pursuant to ORS 311.812.