# BROOKS RESOURCES CORPORATION
### *v.*
## DEPARTMENT OF REVENUE

James V. Hurley and Neil R. Bryant, Gray, Fancher, Holmes & Hurley, Bend, represented plaintiff.

Alfred B. Thomas, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered February 7, 1978.

CARLISLE B. ROBERTS, Judge.

By agreement of counsel, two suits, Tax Court Nos. 989 and 1088, were consolidated for purposes of trial. The plaintiff in each suit is an Oregon corporation, the developer of Black Butte Ranch, a planned unit development subject to the Deschutes County Zoning Ordinance No. PL-5 and Deschutes County Subdivision Ordinance No. PL-2. Its 1,550 acres are located eight miles northwest of Sisters, Oregon, and, when the project is completed, will include 1,250 building lots together with common areas, a water system, a sewer system, two golf courses, and a lodge. The property values placed upon plaintiff's interests by Deschutes County for tax assessment purposes for the tax years 1974-1975 and 1975-1976 were the subject of appeals to the defendant which were determined in Orders Nos. VL 75-474 (dated August 7, 1975) and VL 76-467 (dated July 21, 1976), respectively, for the two years in question. Since those decisions were made, the parties have agreed upon the assessment, as of January 1, 1974, and January 1, 1975, of all aspects of

the assessments except as applicable to the 18-hole golf course,[1] the subject of these suits. The county assessor has given the golf course a separate tax account number and assessed its value to the plaintiff for each of the two tax years as follows: Code 6-2; Assessor's Account No. 14 9 9A 100; true cash value of land on the assessment date, $456,830; true cash value of the improvements (a pro shop, cart barn, hamburger stand) $29,870; total, $486,700.

Plaintiff pleaded (Complaint, ¶ VII) that its 18-hole golf course and its improvements should be given a zero value for property tax purposes "for the following reasons" (argumentatively stated):

"(1) Black Butte Ranch is a Planned Unit Development, which is privately owned and a non-commercial recreational area. It is not operated or intended to attract commercial enterprises. The golf course has not operated profitably in the past and will continue to operate at a loss in the foreseeable future. Therefore, the true cash value of the golf course is zero or nominal.

"(2) Deschutes County's zoning and subdivision ordinances require Planned Unit Developments to have open spaces. The golf course is an integral part of the open space requirements at Black Butte Ranch. Furthermore, substantial portions of the golf course are included in plats filed with the county. Plaintiff has also represented to lot owners that the golf course would remain in its present condition and continue to operate as it has in the past. Plaintiff is estopped from changing the operation of the golf course or developing the golf course into something else. The above restrictions make the property unmarketable and without profit earning potential, and, therefore, the true cash value of the property is zero or nominal.

"(3) The sold lots at Black Butte Ranch are assessed at their sales price. These prices include the value of all the amenities at Black Butte Ranch, including the golf course, to each of the respective lots.

[1]Plaintiff also owns a nine-hole golf course, located in the Black Butte Ranch development which is not involved in these suits. Except where specified otherwise, reference to the golf course property herein relates to the 18-hole golf course.

[ 332 ]

"(4) By assessing both the sold lots and the golf course, the defendant is double assessing the property.

"(5) If the evidence reveals that a portion of the golf course value is not being assessed in the lots, and that there is some residual value remaining in the golf course that should be assessed to plaintiff during the period of development, then a formula should be applied similar to the assessment formula applicable to the common areas of Black Butte Ranch."

In the Plaintiff's Opening Brief, 2, the plaintiff's issues are stated more succinctly, thus:

"The questions presented are: (1) What is the true cash value of the golf course in view of the restrictions and limitations on plaintiff's rights therein? (2) Does Defendant's assessment constitute double taxation? (3) If the Court determines that the golf course has some independent value during the sales period, what is the proper assessment to plaintiff?"

Beginning with the acquisition of land in 1970, Black Butte Ranch was and is being improved by the plaintiff as a planned unit development under. a Master Design (recorded in Deed Records, Deschutes County, Vol 171, p 501 et seq., August 6, 1970). This document describes, for potential lot purchasers, a high quality development, to be operated under established "ground rules." The design provides for the formation of a Black Butte Ranch Association, to be made up of the body of property owners, *i.e.,* purchasers of lots or of space in condominiums. The association will manage most of the "shared property," when the development is completed (and, in some aspects, before completion). The plaintiff will manage the common or shared property in the interim, using money obtained from the owners through an assessment procedure. The Master Plan provides for land classification and use: (1) lot and condominium areas, owned by the purchasers in fee simple; (2) "shared property," which includes the private ways (streets and paths), recreation and scenic parcels, private recreation areas, and cattle-grazing areas (the last

[ 333 ]

category subject to lease by cattlemen); and (3) "developer's areas" as to which the developer (plaintiff) intends to retain ownership and control indefinitely, including the golf course, the water and sewerage systems, and the lodge area. As developer, the plaintiff retains a significant amount of administrative control but is required under its agreements to transfer all of its functions as manager to the Black Butte Ranch Association (a) when 50 percent of the land area has been sold or designated as "shared" or (b) by 1985, or (c) when the developer chooses, whichever first occurs.

Mr. Gene C. Mason, a professional golfer with substantial experience in the operational and business aspects of managing a golf club, was retained as golf director at Black Butte Ranch, with instructions to manage the golf course as a "noncommercial operation," which means (quoting Mr. Mason, Tr 104-105):

> "* * * [W]e are not in the convention business. * * * We don't allow any meetings, the use of our golf course in a commercial nature at any time. We do not have any tournaments, other than the occasional giving of our golf course for a junior event, * * * charging nothing for it. * * *"[2]

Lot purchasers are not charged a specific membership fee for the right to use the course. They must pay daily greens fees (among the highest charged in Oregon). The plaintiff's contract with property owners provides that, while the amount of the fee is solely within the control of the plaintiff, property owners will be charged only 80 percent of the stated fee and property owners and their guests will have first access to the course (to the total exclusion of nonmembers, if necessary). The management also guarantees that the course will be kept in good condition and the use of the land as a golf course will never be terminated.

---

[2]The "noncommercial" aspect of the development was repeatedly emphasized by plaintiff's witnesses, but there can be no denial that it is an enterprise entered into for profit. The testimony is convincing that the developer is genuinely striving to create a "noncommercial," "country club" atmosphere.

The matters just mentioned are regarded by the plaintiff as part of the restrictions and limitations on plaintiff's rights in the property which render the property's assessed value for tax purposes as zero. In addition to giving purchasers preferential starting times, preferential greens fees, and the promise to maintain a high quality championship golf course, plaintiff also emphasizes the additional restrictions required by the county's zoning and subdivision ordinances, requiring the area used as a golf course to be retained as open space. This open space is requisite to meet the county's conditions for approval of a planned unit development (which permits buildings to be clustered upon smaller lots than otherwise would be allowed, if the total lot areas plus the open space equal the total space otherwise required for standard size lots in a subdivision).

■ As defendant has pointed out, none of these "restrictions" has been proved to be deleterious to the use of the golf course as the highest and best use of the property or to the developer's long-term prospect for profits. The plaintiff fully expects to obtain a complete return of its capital investment in the golf course through the sale of lots. (Plaintiff's testimony is that, in determining the price of individual lots, one-third of the sales price represents the cost of water, sewer and roads; an additional one-third represents the cost of off-site improvements including the golf course; and the final one-third of the sales price represents profit and overhead.) Plaintiff admits that golf course lots are sold at a substantial premium over other lots (as much as 100 percent) and the value of all lots is increased by the availability for use and the park-like aspect of the golf course. The court notes plaintiff's argument (Pl Reply Br, 6-7):

"The decision to plan and operate the Golf Course in the above manner has apparently been a sound decision. Land with an approximate value of $1,000,000 ($650 per acre x 1550 acres) has been converted into land and improvements which were on the Deschutes County

Rolls on January 1, 1974 at 19 million. (Tr 139, 140) The per acre value is approximately twice that of Sunriver. (Tr 141)

"Golf Course lots have sold at significant premiums over other lots. (Tr 37) * * *"

The court finds that the alleged restrictions and limitations on plaintiff's rights were specifically initiated by plaintiff as a part of its overall plan and have in no way been detrimental to the plaintiff. It will recover its total capital investment in the golf course through the sale of the lots and it will be in position to charge greens fees indefinitely. Its Master Design states (Sec VII) that the developer, as owner, will pay taxes on the golf course but that fees and charges will be modified as made necessary by the imposition of taxes.

Plaintiff also contends that, since the lots sold at Black Butte Ranch are assessed by the county at their sales price, the assessments necessarily include the value of the amenities to each respective lot and, by assessing both the sold lots and the golf course, "the defendant is double assessing the Golf Course." (Pretrial Memo, 3.)

The testimony presented to the court does not prove this contention. Without a history of sales, other than those by plaintiff to lot purchasers, and insufficient data for an income approach to value, the assessor's only recourse was to use the purchase price of the lots as the basis for his determination of true cash value.[3] It is evident that the assessor does not consider that double taxation is involved, inasmuch as he separately assessed both lots and golf course. The plaintiff has submitted no appraisal report or testimony in support of its argument, and the argument is not sustained by reason.

---

[3]This situation can be expected to change. Mr. William Lee Smith, president and manager of the plaintiff corporation, testified that all the lot owners' values had increased since the time they purchased their respective lots.

■ The purchaser of the lot is obtaining a specific piece of real property, together with a specific list of amenities, including preferential treatment at the golf course, but he is purchasing neither legal nor equitable title in any part of the golf course, any more than he is purchasing any part of the water system by virtue of his right to hook up his improvements to the water system and to pay certain rates. The lot owner must pay a substantial greens fee each day he uses the course. No testimony has been elicited to prove that, by purchase of his lot, the owner also obtained a *property* right in the golf course. When this plaintiff made the same argument in *Brooks Resources v. Dept. of Rev.,* 276 Or 1177, 558 P2d 312 (1976), in respect to its water system, the Supreme Court held that the water system was not the subject of double taxation and that the purchasers of lots had no legal or equitable interest in the system. (*See* 276 Or at 1187, 558 P2d at 317.)

> "Since the lot owners have acquired no ownership rights in the water systems, but only the right to have water delivered to their lots, there is no double taxation when both the water systems and the individual lots are assessed and real property taxes are levied upon them."

The same reasoning used by the court in that case with regard to the water system applies here to the golf course. The plaintiff has retained the same title and bundle of property rights to the water system and to the golf course.

■ The plaintiff has further contended that the lack of value in the golf course is demonstrated by its net income loss in the operation of the 18-hole course from its first use, in 1972, through 1976. Plaintiff relied in part upon the testimony of Mr. William D. Caudell, C.P.A., its comptroller, whose statement of income and expense for golf course operations for 1972 to 1976 is set out in Plaintiff's Exhibit 11. Mr. Caudell's capability is unquestioned, but he is not a property appraiser and was not requested to prepare the data usable in an income approach to value. (For

example, his expense statement includes an item for interest on advances. This is not allowable as "an item in the production of income" within the income approach. Other aberrations from an "income approach" in Plaintiff's Exhibit 11 were noted by defendant's expert witness, Mr. Kenney. *See* Tr 174.)

▇ Mr. Caudell's exhibit shows a decrease in net loss each year. With the elimination of items improperly used in the schedule for an income approach, there would be a net profit in 1976 and possibly in earlier years. However, speculation is useless. Plaintiff did not produce acceptable evidence for the income approach to value. *Cf. Shields et al v. Dept. of Rev.,* 5 OTR 160, 165-166 (1972), *Aff'd in this respect,* 266 Or 461, 513 P2d 784 (1973).

In fact, plaintiff produced no witnesses who were expert in property valuation and no evidence based upon the customary approaches to value used by appraisers. *See* American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* (6th ed, rev 1977); *Encyclopedia of Real Estate Appraising* (Friedman ed, rev & enlarged ed 1968).

Plaintiff has relied heavily upon the decision in *Tualatin Development v. Dept. of Rev.,* 256 Or 323, 473 P2d 660 (1970), as a basis for asserting a zero valuation in the golf course for property tax purposes. However, the facts in *Tualatin,* compared to the facts here, are so different that, as Mr. Justice McAllister said, in *Brooks Resources, supra,* 276 Or at 1186, 558 P2d at 317: "We find that in this case *Tualatin* is not apposite." The golf course in *Tualatin Development, supra,* was of the "executive" type, with modest planning, proportions and program, at the opposite end of the scale from Black Butte Ranch's championship course. Tualatin's course would have been abandoned by its owner if possible; Black Butte felt it useful to build a second course of nine holes.

The final issue to be resolved is the true cash value of the property comprising the golf course as of

January 1, 1974, and January 1, 1975. The only acceptable testimony on this issue in the record is that of defendant's expert property appraisal witness, Mr. A. J. Kenney, a trained man with 22 years of experience in property appraisal. He testified from a written appraisal report (Def Ex A), and gave cogent reasons for using and relying on the cost approach and for rejecting the income and market data approaches. He concluded that the true cash value of the subject property as of January 1, 1974, was $840,000, of which $760,000 was allocated to land (including the cost of building the golf course and constructing its subsurface improvements), and, to improvements, $80,000. As of January 1, 1975, he found the true cash value to be $950,000 (land, $865,000; improvements, $85,000).[4]

Mr. Kenney's testimony constitutes the preponderance of the evidence on the question of true cash value (ORS 305.427). Accordingly, the court finds these sums to be the true cash value of the subject property on the assessment dates involved. No double taxation has been proved. The plaintiff's claim for an allocation of values between lot owners and the corporation lacks foundation. The county assessor and tax collector shall correct the assessment and tax rolls for the tax years 1974-1975 and 1975-1976 as required by this decision.

Defendant is awarded its costs.

---

[4] ▮ This is a substantial increase over the assessed values which defendant, in its Answer, asked to be affirmed. Just before trial, defendant moved to amend its pleadings to conform with Mr. Kenney's appraisals. The motions were denied at the trial as untimely. However, since Mr. Kenney's testimony constituted the clear preponderance of the evidence, the court must use it. ORS 305.435, as amended by Or Laws 1977, ch 870, § 30, effective October 4, 1977. Mr. Smith, president of the plaintiff corporation and officer in charge of all its operations from the beginning, testified that "cost of the golf course" was "around $900,000." (Tr 32.) Mr. Kenney believed that this figure omitted the value of the improvements. (Tr 169.)