DECISION
This matter is before the court on cross-motions for summary judgment. Plaintiff appeals Defendant's partial denial of its application for exemption, for the 2006-07 tax year, on certain real property affected by a lease between Plaintiff and the Port of Portland (Port), and used by Plaintiff for the operation of its import vehicle receiving and processing center. Defendant's determination, dated April 18, 2006, was made in response to Plaintiff's request for computation of payment in lieu of tax pursuant to ORS 307.120(3).
Oral argument was heard in the Oregon Tax Court in Salem on January 9, 2008. Plaintiff was represented by David L. Canary, Attorney at Law, Garvey Schubert Barer. Defendant was represented by Jed R. Tompkins, Assistant County Attorney. For ease of reference, the parties will be referred to as Toyota, the County, and the Port.
 I. STATEMENT OF FACTS
The Port is organized under the laws of the State of Oregon and, pursuant to ORS 307.090(1), the land owned by the Port is exempt from taxation. Toyota is a California corporation, and a taxable entity registered to conduct business in Oregon.
On the applicable assessment date — January 1, 2006 — the Port owned approximately 82.96 acres of land located at Terminal 4 in Multnomah County, Portland, Oregon, and identified *Page 2 
in the records of the Multnomah County Division of Assessment and Taxation as Account Nos. R537406, R537417, R537423, and R580045.
On October 9, 2002, the Port and Toyota entered into a lease, hereinafter referred to as the "2002 lease," whereby the Port leased approximately 82 acres of land at Terminal 4 to Toyota, for Toyota's use as an import vehicle receiving and processing facility. Under the terms of the 2002 lease, Toyota agreed to finance and construct certain improvements "consisting generally of the perimeter fence, site and building improvements, and rail spur track, [associated with its import vehicle center and] identified as `Lessee Improvements-Phase 2.'" (Stip Ex 1 at 12, 75, 82.) The Port agreed to demolish certain warehouses and an existing rail spur to make way for Toyota's new facility and to construct certain Phase 1 and Phase 2 improvements, most if not all of which were "outside the fence" improvements including dock modifications, fill material, electrical utility work, lighting and pavement improvements, plus perimeter landscaping and storm water collection and treatment systems. (Id. at 75, 82-86.) Toyota agreed to reimburse the Port for the Phase 1 improvements in an amount not to exceed $2,186,000, plus oversight costs not to exceed $165,000. (Id. at 82.) The term of the 2002 lease was 15 years, commencing April 1, 2005, with two 5-year renewal options. The parties agreed to a basic rent of $1,406,000 per year, with annual adjustments based on an agreed upon formula. (Id. at 18.)
As part of the Lessee Improvements-Phase 2, Toyota financed and constructed a Body Shop building and a Post-Production Options (PPO) building. Those two buildings are located on 4.03 acres of the approximately 82 acres of land Toyota leases from the Port. It is the ownership and use of those buildings that forms the basis for the present dispute. The use of those buildings is described below. *Page 3 
There is no deed or bill of sale in the records of Multnomah County regarding ownership of the improvements described in the 2002 lease.
Pursuant to ORS 307.120(3), Toyota properly and timely filed with the County a request for exemption and computation of the payment in lieu of tax for the 82.96 acres of leased land and the improvements thereon described in the 2002 lease, and provided all of the information necessary to enable the County to complete the in lieu computation.
The County subsequently notified Toyota by letter dated April 18, 2006, that Toyota's request for exemption and in lieu tax payments had been granted in part, for parcels R537406, R537417, and R537423, totaling 78.93 acres of land and certain improvements with a real market value of $2,613,600. The County denied Toyota's request for exemption and in lieu tax computation on the remaining 4.03 acres of land, and on $20,305,500 worth of improvements, including the Body Shop and PPO buildings, on the grounds and for the reason that the County believed that the property did not meet the statutory criteria set forth in ORS307.120. The County moved the property it believed to be non-qualifying to a new account identified as Account No. R580045. This appeal involves the property denied exemption by the County and identified under that newly created account (i.e., the 4.03 acres of land and the buildings thereon).
The parties agree that, aside from the 4.03 acres, the land leased by Toyota under the 2002 lease qualifies for exemption and in lieu computation under ORS 307.120. The real market value of the 4.03 acres of land denied exemption is $701,440. As stated above, the real market value of the improvements for which exemption was denied is $20,305,500.
The parties entered into two previous lease agreements on property other than that subject to the 2002 lease. The first lease was entered into on July 1, 1976, and the second on January 31, 1986. In each case, portions of the property were subject to full ad valorem taxation because the *Page 4 
property did not qualify for exemption and in lieu computation under ORS307.120. In the case of the 1986 lease, the Oregon Department of Revenue issued a decision finding that portions of the property did not comply with the statute. Toyota v. Multnomah County Assessor, Or Dept. of Rev. No 89-2420 (1992).
The parties agree to the following description of Toyota's import vehicle receiving and processing facility operations on the property subject to the 2002 lease. (See Stip Facts at 12-13.) Toyota automobiles are transported by ship from Japan and are received at the Port's Terminal 4, next to the subject property. The automobiles are off-loaded from the ship transporting the automobiles to a receiving area on the subject property. If the automobiles have been damaged during shipment to the Port, they are taken to the Body Shop building on the subject property where dings, creases, dents and the like are repaired, including repainting bumpers and body panels, to return the automobiles to the condition they were in at the time they were loaded onto the ship in Japan for shipment to the Port. The Body Shop building is 21,173 square feet. Part of the Body Shop building, a maintenance shop and a mechanical shop that comprise a total of 8,576 square feet, is used for servicing vehicles and equipment used by Toyota on the subject property.
Some of the automobiles Toyota ships from Japan to the Port's Terminal 4 are taken to the PPO building. There, the automobiles are outfitted with roof racks, rear wind deflectors, drop hitches, audio/alarm/DVD devices, running boards, and other post-production options according to dealer specifications. The PPO building is 65,186 square feet. The PPO building includes a 43,661 square foot warehouse where parts are stored. The PPO building also includes Toyota's office that is 21,525 square feet, where Toyota's operations at the Port are administered. *Page 5 
 II. ISSUES 1) For purposes of ORS 307.120(1), [1] did the Port own the improvements on the 4.03 acres within the 82 acres of land leased by Toyota from the Port, and lease those improvements to Toyota as of January 1, 2006?
 2) If the Port owned the improvements and leased them to Toyota, was Toyota using the Body Shop and PPO buildings, and the underlying 4.03 acres, "for the purpose of the berthing of ships, barges or other watercraft * * * the discharging, loading or handling of cargo therefrom or for the storage of such cargo directly incidental to transshipment, * * *" as required by ORS 307.120(1)(a) for exemption and payment in lieu of taxes?
 III. ANALYSIS
A. Introduction and Statutory Overview
As a general rule, all real property in Oregon is subject to assessment and taxation. ORS 307.030(1). ORS 307.090(1) specifically exempts from taxation "all public or corporate property used or intended for corporate purposes of the several counties, cities, towns, school districts, irrigation districts, drainage districts, [and] ports * * *." Moreover, while ORS 307.110(1) provides that such publicly-owned property is nonetheless subject to assessment and taxation when held under lease by a taxable owner, an exception exists as provided in ORS307.120.[2]
ORS 307.120 provides in relevant part as follows:
 "(1) Real property owned or leased by any municipality and real and personal property owned or leased by any * * * port organized under the laws of *Page 6 
this state is exempt from taxation to the extent to which such property is:
 "(a) Leased, subleased, rented or preferentially assigned for the purpose of the berthing of ships, barges or other watercraft * * *, the discharging, loading or handling of cargo therefrom or for the storage of such cargo directly incidental to transshipment[.]"
The Port of Portland is a "port organized under the laws of this state," and the subject property, specifically the Body Shop and PPO buildings, and the 4.03 acres upon which those buildings are situated, is exempt from taxation provided that property satisfies the ownership and use requirements under ORS 307.120(1).[3]
Specifically, the disputed property is exempt if, on January 1, 2006: (1) the Port owned the property and leased it to Toyota, and (2) Toyota used the property in a qualified manner.
The parties dispute whether the Port or Toyota owns the buildings, and whether Toyota's use of those buildings meets the requirements in subsection (1)(a) of ORS 307.120 that would entitle Toyota to exemption and payment in lieu of taxes on that property. Because Toyota must satisfy both the ownership/lessee and use requirements to succeed, a failure to meet either of those requirements disqualifies the property from the benefits of the statute. For the reasons set forth below, the court concludes that the property does not meet the requirements of ORS307.120(1) and is, therefore, subject to full ad valorem assessment and taxation.
B. Rules of Construction
Toyota urges the court to adopt the rule of construction set forth inCity of Eugene v. Keeney, 134 Or 393, 397, 293 P 924 (1930) (City ofEugene), and reiterated more recently by the *Page 7 
Tax Court in Port of Coos Bay v. Dept. of Rev., 9 OTR 339, 341 (1983),rev'd on other grounds, 298 Or 229, 691 P2d 100 (1984) (Port of CoosBay), that "[w]here * * * public corporations are involved, exemption is the rule and taxation the exception." (Plaintiff's Memorandum in Reply to Defendant's Response and Cross-Motion for Summary Judgment at 1-2.) (Hereinafter Ptf's Reply Memo.) As such, Toyota insists that the exemption statute should be liberally, not strictly, construed. (Id. at 2.) Toyota asserts that liberal construction is appropriate because public corporations are involved, as in Port of Coos Bay, because public policy favors exemption of property of a municipal corporation, and because the Port, as lessor, is assumed to be the owner of the improvements constructed by the lessee Toyota on the lessor/Port's property under general principles of real estate law, absent proof to the contrary. (Id. at 2-3.)
The County disagrees, urging the court to adopt a rule of strict construction, asserting that under Dove Lewis Mem. Emer. Vet. Clinic v.Dept. of Rev., 301 Or 423, 426, 723 P2d 320 (1986) (Dove Lewis), a "fundamental principle in Oregon [is] that `taxation is the rule and exemption from taxation is the exception.'" (Defendant's Response and Cross-Motion for Summary Judgment at 3.) (Hereinafter Def's Resp.) Citing Eman. Luth. Char. Bd. v. Dept. of Rev., 263 Or 287, 291,502 P2d 251 (1972), the County insists that under the rule of strict construction, "`the statute will be construed reasonably to ascertain the legislative intent, but in the case of doubt will be construed against the taxpayer.'" (Def's Resp at 18-19.)
As indicated above, there are two issues in this case: whether the Port or Toyota owns the property, and, if the Port is the owner and Toyota the lessee, is Toyota using the property in a statutorily qualified manner. The court sees no reason to apply either a liberal or strict rule of statutory construction in this case to determine ownership. Liberal construction of exemption statutes is premised upon public ownership of the property and strict construction on private *Page 8 
ownership. The particular property over which ownership is at issue in this case is the buildings constructed by Toyota on Port land leased to Toyota. The parties disagree about who owns those buildings. That being the case, it would be inappropriate to apply either rule of construction because the court must first determine whether it is dealing with public or private property. See Pacific States Marine Fisheries Comm'n v. Dept.of Rev., 19 OTR ___, ___ (Sept 12, 2007) (slip op at 4), WL 2743326 at *2, appeal filed, SC S055392 (filed Oct 16, 2007) (Pacific States MarineFisheries) (ruling that there is "no reason to apply a rule that presumes the existence of `public' property to a case in which the question of whether the property is `public' is the point at issue");see also Port of Coos Bay v. Dept. of Rev., 298 Or 229, 236, 691 P2d 100
(1984) (relying on two previous decisions, the court concluded that it was "unnecessary to refer to a liberal or a strict rule of statutory construction * * *" to discern legislative intent under ORS 307.120, relying instead upon dictionary definitions of the relevant statutory terms).
The court in this case will construe the statute reasonably, giving due consideration to the ordinary meaning of the words of the statute and the legislative intent. If it is decided that the Port owns the buildings, then public property is involved and the court's analysis of the use issue would benefit from the liberal rule of construction, perPacific States Marine Fisheries, as appropriate. 19 OTR at ___ (slip op at 4), WL 2743326 at *2.
C. Burden of Proof
The taxpayer claiming exemption has the burden of proof. DoveLewis, 301 Or at 426-27; North Harbour Corp. v. Dept. of Rev.,16 OTR 91, 95, WL 1925822 at *2 (2002); ORS 305.427 (providing that burden of proof falls upon the party seeking affirmative relief). Under ORS305.427, Toyota must establish its entitlement to exemption by a preponderance of the evidence. *Page 9 
D. Ownership
ORS 307.120 requires that the Body Shop and PPO buildings be owned (or leased) by the Port, and leased to Toyota, if Toyota is to satisfy the first of the two exemption requirements. The buildings were constructed by Toyota, at its expense, on land owned by the Port and leased to Toyota. The County denied the exemption on the Body Shop and PPO buildings because it determined that Toyota owned those buildings. (The County also denied exemption on the 4.03 acres underneath and directly associated with those buildings.) The determination of ownership is based on the 2002 lease agreement, a contract entered into between Toyota, Plaintiff in this appeal, and the Port, which is not a party in this matter.
The Oregon Supreme Court has laid out three levels of analysis that the court must follow in interpreting a contract. Yogman v.Parrott, 325 Or 358, 361, 937 P2d 1019 (1997) (Yogman). "First, the court examines the text of the disputed provision, in the context of the document as a whole. If the provision is clear, the analysis ends."Id. As part of that first level of analysis, the court has stated:
 "When considering a written contractual provision, the court's first inquiry is what the words of the contract say, not what the parties say about it. To determine that, the court looks at the four corners of the written contract, and considers the contract as a whole with emphasis on the provision or provisions in question.* * * The meaning of disputed text in that context is then determined.* * * In making that determination, the court inquires whether the provision at issue is ambiguous. Whether terms of a contract are ambiguous is a question of law. * * * In the absence of an ambiguity, the court construes the words of a contract as a matter of law."
Eagle Industries, Inc. v. Thompson, 321 Or 398, 405, 900 P2d 475 (1995) (Eagle Industries) (internal citations omitted).
If the contract terms are ambiguous after examining the text and context of the lease agreement, the court proceeds to the second of the three analytical steps by examining extrinsic *Page 10 
evidence to ascertain the intent of the parties and thereby resolve the ambiguity. Yogman, 325 Or at 363-64. If those first two analytical steps fail to resolve the ambiguity, the court proceeds to the third and final step, which is to rely on maxims of construction. Id. at 364.
Section 1.1 of the 2002 lease, titled "Agreement to Lease and Description of Premises," provides:
 "The Port leases to Lessee [Toyota] and Lessee leases from the Port approximately eighty-two (82) acres of land located at Terminal 4 * * * together with all `Improvements' located thereon (collectively, the `Premises'), subject to the provisions of Section 1.3 below regarding the Phase 1 area. As used in this Lease, the term `Improvements' shall mean the `Phase 1 Improvements' and the `Lessee Improvements — Phase 2' described in Section 1.2 and in the Workletter attached as Exhibit B, and any other improvements or enhancements located on or made to the Land by the Port or Lessee, whether now in existence or made in the future."
(Stip Ex 1 at 12) (emphasis added).
In construing the text of a contract, the court's first inquiry is what the words of the contract say. Eagle Industries, 321 Or at 405. The court must ascribe the "plain" meaning to those words. Groshong v.Mutual of Enumclaw Ins. Co., 329 Or 303, 308, 985 P2d 1284 (1999).
Section 1.1 states that the Port is leasing to Toyota the 82 acres of land "together with all `Improvements' located thereon * * *." The parties expressly defined "improvements" in Section 1.1 of the lease to include "Lessee Improvements-Phase 2," which elsewhere in the lease is defined to include the Body Shop and PPO buildings. A "lease" is a conveyance of "any less interest than that of the lessor." Webster'sThird New Int'l Dictionary 1286 (unabrideged ed 2002).
The implication of Section 1.1 is that the Port owns the land and all the buildings, including the Body Shop and PPO buildings, and leases them to Toyota, or that the Port has at *Page 11 
least an interest greater than that of Toyota. It is undisputed that the Port owns the land, and either the Port or Toyota presumably owns the buildings because they were built and used by Toyota, on land owned by the Port. However, Section 1.1 does not specifically state who owns the disputed buildings, and nowhere in the lease does it say that the Port leases the buildings from another owner. Eagle Industries instructs the court to "consider the contract as a whole with emphasis on the provision or provisions in question." 321 Or at 405.
What do the other provisions of the lease say about ownership? One section speaks specifically to ownership of the improvements, and the County insists it contains "[t]he most concrete statement of ownership. (Def's Resp at 11.)
 Section 5.2, entitled "Ownership of Improvements," provides:
 "Subject to Section 5.1.2, and at the expiration or earlier termination of this Lease, the Port shall become the owner of all the improvements constructed by Lessee or the Port upon the Land unless the Port, in its sole discretion, elects not to take ownership or title thereto[.] * * * In such event, Lessee shall remain liable therefore."
(Stip Ex 1 at 25) (emphasis added).
The County contends that "the terms of the 2002 Lease establish a scheme whereby Toyota owns the Improvements throughout the life of the Lease and the Port assumes ownership thereof, if it so chooses, only at the termination of the Lease." (Def's Resp at 11.) The County argues that under Section 5.2, the Port does not currently own the improvements. Rather, there is a "presumption underlying this provision * * * that Toyota currently owns the Improvements." (Id.) The County insists that Section 5.2 merely gives the Port an option to become the owner and that, if the Port elects not to assume ownership, ownership remains in Toyota. (Id.)
That interpretation is consistent with the general rule in Oregon and other jurisdictions that, "in the absence of an agreement, any buildings or improvements erected by the tenant will *Page 12 become the property of the landlord at the termination of thelease." Shields v. Dept. of Rev., 266 Or 461, 470, 513 P2d 784 (1973) (Shields) (emphasis added) (citing Title Trust Co. v. DurkheimerCo., 155 Or 427, 453, 63 P2d 909, 64 P2d 834 (1937); Gen. PetroleumCorp. v. Schefter, 141 Or 349, 352, 16 P2d 645 (1933); 3 Thompson on Real Property 531, 532, § 1140 (1959)). However, as the court noted inShields, "the parties may agree that any improvements erected by the tenant may remain the property of the tenant and be removable by him."266 Or at 470 (citations omitted).
In Paulina Lake Historic Cabin Owners Ass'n v. USDA Forest Serv., the Federal District Court explained the evolution of the law regarding ownership of improvements erected by a tenant on the landlord's property and noted that the "rule at common law was that `all buildings become a part of the freehold as soon as they are placed upon the soil.'"577 F Supp 1188, 1194 (US DC Or 1983) (Paulina Lake) (citing Kutter v.Smith, 69 US (2 Wall) 491, 497, 17 L Ed 830 (1864)). The court went on to state that:
 "[t]he modern rule is that the intention of the parties controls. * * * The common law's influence may still be seen, however, in the modern presumption that in the absence of an agreement to the contrary any buildings erected by the tenant become the property of the landlord at the termination of the lease."
Paulina Lake, 577 F Supp at 1194 (citing Shields, 266 Or at 470) (emphasis added) (internal citations omitted).
In the 2002 lease between Toyota and the Port, the parties agreed that the buildings would become the property of the Port "at the expiration or earlier termination of this Lease * * * unless the Port, in its sole discretion, elects not to take ownership or title thereto[.] * * * In such event, Lessee shall remain liable therefore." (Stip Ex 1 at 25.) That agreement is consistent with, and in fact appears to anticipate, the general rule set forth in Paulina Lake and discussed immediately above, that the buildings would become the property of the Port at the end of the lease, as well as *Page 13 
the rule set forth in Shields that "the parties may agree that any improvements erected by the tenant [will] remain the property of the tenant and be removable by him." Shields, 266 Or at 470. Here, the parties left it to the Port to decide whether ownership would pass from Toyota to the Port. If the Port does nothing, it takes ownership of the buildings at the termination of the lease consistent with the general rule discussed above that the buildings "become the property of the landlord at the termination of the lease." Paulina Lake,577 F Supp at 1194 (citing Shields, 266 Or at 470) (emphasis added). The Port may, however, elect not to take ownership of the buildings, in which case, consistent with Shields, the "improvements erected by the tenant [will] remain the property of the tenant and be removable by him."266 Or at 470.
Of course, construing the lease as providing that Toyota owns the buildings during the term of the lease and that the Port becomes the owner at the termination of the lease raises the question of why the parties provided in Section 1.1 that the Port was leasing the buildings to Toyota. (See Stip Ex 1 at 12, 25.) Moreover, Shields instructs that a provision in a lease assigning ownership "is not conclusive [of ownership], at least for tax purposes, if other indicia of ownership are not present." 266 Or at 471. Thus, the question is whether there are other indicia of ownership.
The right of removal is a significant provision in any lease regarding the issue of ownership. Id. at 471; see People ex rel Int'l Nav. Co. v.Barker, 153 NY 98, 101, 47 NE 46, 47 (1897) (stating that "[i]f the right of removal is reserved to the lessee in a lease, then in such a case he will be regarded as an owner of real estate for the purpose of taxation."); see Beck v. F.W. Woolworth Co., 111 F Supp 824, 827-28 (DC Iowa 1953) (quoting 73 ALR 828) ("[A]s between landlord and tenant, where the lease is silent as to the payment of taxes, the burden of taxes upon improvements removable by the tenant must fall on the latter."). Shields involved the question of *Page 14 
whether the tenant's improvements in excess of the allowance granted by the landlord were assessable to the landlord as owner of the buildings, or to the tenants. 266 Or at 466. The improvements at issue inShields were items installed by the tenants leasing space in a regional shopping center and defined in the lease as "Tenant's Work," and they "include[d] such items as ceilings, plumbing, heating and air conditioning equipment, and electrical wiring." Id. at 468. The parties in that case had agreed contractually that the tenants were ultimately responsible for payment of the taxes on the disputed items included in Tenant's Work, but the issue of whether the property would be valued and assessed to the tenants or the landlord turned on who was deemed to be the owner of such property.[4] Id. at 469-70. The court ultimately concluded that the landlord was the owner of the improvements because "the lease lack[ed] the significant feature of right to removal."Id. at 471 (emphasis added).
In this case, there are two provisions of the 2002 lease regarding the right of removal of the improvements. Section 5.3, titled "Waste, Removal and Demolition," reads as follows:
 "Except as provided elsewhere in this Lease, Lessee shall not cause or permit any waste or damage, disfigurement or injury to the Premises or the Improvements and shall not remove or demolish, in whole or in part, any Improvements on the Premises without the prior written approval of the Port, which the Port shall not unreasonably withhold."
(Stip Ex 1 at 25.)
 Section 11.3, titled "Removal of Improvements Constructed by Lessee," reads:
 "Subject to the provisions of Sections 5.1, 5.2, and 8.8, all Improvements constructed by Lessee on the Premises at the expiration or earlier termination of *Page 15 
this Lease shall, at the Port's option, become the sole property of the Port. Lessee shall have no obligation to remove the Improvements the Port elects to take and shall execute prior to termination any bill of sale or deed conveying title to such Improvements to the Port in mutually agreeable form."
(Id. at 55.)
The County argues that Section 5.3 gives Toyota wide latitude to remove the improvements during the term of the lease, and is consistent with Toyota's ownership of the improvements. (Def's Resp at 13.) Moreover, the County insists that if the Port owned the improvements, the requirement under Section 11.3 that Toyota execute a bill of sale or deed conveying the improvements to the Port (if the Port opts to take the property) would not be necessary. (Id. at 12, 13.) Toyota responds that if it were indeed the owner of the improvements, it would have the unfettered right to remove or demolish the improvements. (Ptf's Reply at 16.)
The court construes those two sections of the 2002 lease as consistent with Toyota's ownership of the improvements during the term of the lease, with ownership then shifting to the Port, unless the Port opts not to take that property. That conclusion is based on the fact that Toyota has considerable latitude to remove the improvements during the term of the lease, in accordance with Section 5.3, and, under Section 11.3, when the lease expires or terminates, Toyota has no obligation to remove the improvements which "shall, at the Port's option, become the sole property of the Port." (Stip Ex 1 at 55.) Thus, the "significant right of removal" of the improvements by Toyota during the term of the lease is not lacking, although it is qualified by the provision in Section 5.3 requiring Toyota to get the Port's prior written approval.See Shields, 266 Or at 471.
The Shields court found further support for its decision that the landlord was the owner of the improvements from three other lease provisions whereby the parties assigned the landlord ownership of any structural changes or alterations made by tenants, the parties omitted Tenant's *Page 16 
Work from the provision requiring tenants to insure their property, and the parties omitted Tenant's Work from the provision granting tenants a share in condemnation payments. Id. at 471-72.
Here, Section 14.3 of the 2002 lease provides that, in the event of a taking, "[c]ompensation for all Port Improvements shall belong to the Port, and compensation for all Lessee Improvements and any other improvements constructed by Lessee, if any, shall belong toLessee." (Stip Ex 1 at 62) (emphasis added). Under Shields, ownership of property may be inferred from the right to receive proceeds of a condemnation award. 266 Or at 471-72.
Toyota is also required, pursuant to Section 9.3.2 of the 2002 lease, to maintain property insurance coverage for "all buildings, boilers and machinery, fixtures, equipment, and all other improvements * * * in an amount equal to one hundred percent (100%) of the replacement value." (Stip Ex 1 at 50.) Again, under Shields, ownership of property may be inferred from the requirement to insure the property. 266 Or at 471. Section 10.3.3 of the 2002 lease addresses the allocation of insurance proceeds upon early termination due to major casualty. (Stip Ex 1 at 53.) After paying for the removal of damaged improvements, and the repair and replacement of such improvements, insurance proceeds are paid to Toyota "to the extent of the value as of the date of the Major Casualty of those Improvements on the Premises, if any, initiated, constructed and paid for by Lessee." (Id.) Toyota's receipt of insurance proceeds to cover the value of damaged improvements is another indicia of ownership of the improvements in Toyota during the term of the lease.
Finally, the calculation of rent under Section 4.3 is based on the square footage of the land only; no mention is made of any rent for the improvements, and it is not part of the basic rent calculation, or subsequent rent indexing under Section 4.4. (Id. at 18-20.) Those provisions *Page 17 
provide further indicia of ownership of the Body Shop and PPO buildings in Toyota during the term of the lease.
 IV. CONCLUSION
The court has reviewed the lease and concludes that Toyota owns the disputed improvements during the term of the lease and that Toyota is therefore not entitled to exemption and in lieu tax payments under ORS307.120. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiff's Motion for Summary Judgment, asserting that the subject property qualifies for exemption and in lieu property tax payments under ORS 307.120, is denied;
IT IS THE FURTHER DECISION OF THIS COURT that Defendant's Response and Cross-Motion for Summary Judgment, asserting that the property is not entitled to exemption and in lieu property tax payments under ORS307.120, is granted; and
IT IS THE FURTHER DECISION OF THIS COURT that the subject property, identified for the 2006-07 tax year as Account number R580045, is not entitled to exemption and the in lieu property tax payments under ORS307.120, but is instead subject to the full ad valorem assessment and taxation for the 2006-07 tax year.
Dated this day of May 2008.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision *Page 18 or this Decision becomes final and cannot be changed.
 This document was signed by Magistrate Dan Robinson on May 2, 2008.The Court filed and entered this document on May 2, 2008.
[1] Unless noted otherwise, all references to the Oregon Revised Statutes (ORS) are to 2005.
[2] ORS 307.110(1) provides in relevant part:
 "Except as provided in ORS 307.120, all real and personal property of this state or any institution or department thereof or of any county or city, town or other municipal corporation or political subdivision of this state, held under a lease or other interest or estate less than a fee simple, by any person whose real property, if any, is taxable * * * shall be subject to assessment and taxation * * *."
[3] The County determined that Toyota did not satisfy the ownership/lessee and use requirements with regard to the use of the Body Shop and PPO buildings and that the amount of land associated with those buildings was 4.03 acres. Accordingly, the County denied Toyota's request for exemption and payment in lieu of taxes on those two buildings and the 4.03 acres. Although the appeal involves all of that property (the two buildings and the 4.03 acres of land), the court's analysis focuses only on the buildings because, if Toyota satisfies the exemption requirements found in ORS 307.120(1) with regard to the buildings, the land (4.03 acres) is also exempt.
[4] The landlord sought to have the disputed improvements ("Tenant's Work" made by the tenants over and above the landlord's allowance) assessed to the tenants as the owners thereof. Shields et al v. Dept. ofRev., 5 OTR 160, 162, 167 (1972). Such separate assessment would negate the need for the landlord to determine the portion of value and corresponding taxes associated with those improvements when valued as part of the building to which they were attached. *Page 1