[No. 1362-1.    Division One—Panel 2.    May 7, 1973.]

HARRY STUCHELL et al., *Respondents*, v. GAYLEY D. MORTLAND et al., *Appellants*.

BRUCE ANDERSON et al., *Respondents*, v. GAYLEY D. MORTLAND et al., *Appellants*.

*Williams & Novack, Edward D. Hansen, Parker Williams,* and *Anderson, Hunter, Carlson & Dewell,* for appellants.

*Graham, McCord, Dunn, Moen, Johnston & Rosenquist* and *Stephen A. Crary,* for respondents.

Horowitz, J.—This appeal concerns principally the right of a sublessor to remove a sublessee's improvements erected during the sublease term after the sublessee has failed to remove his improvements within the period stipulated for that purpose in the sublease.

The facts are briefly these. On October 1, 1944, lessees Mortland[1] executed a written lease with the Indian heirs of Charley Farmer of recreational real estate known as Tulalip Shores in Snohomish County, Washington, for a term which the parties agree expired July 6, 1970. The lease expressly bound the parties thereto and their respective successors in interest. Lessees also entered into a companion lease covering certain tidelands abutting the Tulalip Shores property. By resolution of the officers of the Tulalip Tribes of Tulalip Reservation, lessees, sublessees, residents or assigns were given "the right to enjoy the tide lands except at such restricted locations and periods when Indians are fishing." The resolution further provided that the tidelands lease was renewable at lessees' option if lessees received a renewal of the Charley Farmer lease, the term of the renewed tidelands lease to be for a like period.

Lessees entered into possession of the premises, developed and subdivided it, and installed a water distribution system and other improvements thereon. Lessees from time to time also subleased individual tracts of the subdivided property to a number of people, including the Stuchell and Anderson groups of sublessees, the plaintiffs herein. The subleases, like the lease, were for terms expiring on July 6, 1970. The subleases were all on identical printed forms prepared by lessees Mortland.

Subsequently, the sublessees erected houses and other improvements, probably including septic tanks, on their respective subleased tracts, all as permitted but not required by sublease paragraphs 3 and 5. Paragraph 3 limited

[1]The original lessees were Thomas G. Mortland and his wife, Elizabeth M. Mortland. At the time the actions below commenced, and for some time prior thereto, defendants held lessees, interest. The phrase "lessees Mortland" refers to the owners of the lessees' interest at the time to which the reference in the opinion relates.

permitted structures to "one single, detached private residence, and one guest house and/or outbuilding . . ." Paragraph 5 permitted plumbing installations, including septic tanks. The water distribution system on the leased premises apparently supplied the subleased tracts with fresh water.

In 1962, as a result of enabling legislation, Tulalip Shores, Inc., a Washington corporation, acquired title to the leased property, subject, however, to the Mortland lease which had become effective July 6, 1945. Later Tulalip Shores, Inc. sold or contracted to sell certain individual subleased tracts, subject to the Mortland lease, to the Stuchell group of sublessees. The Anderson group of sublessees did not purchase their subleased lots, but retained their sublease interests.

The lease and subleases contain provisions dealing with improvements to be installed, the right of removal and the status of unremoved improvements. These provisions will be later analyzed. Suffice it to say at this point, lessees were given 120 days following lease termination to remove those improvements which the lease permitted lessees to remove, and the sublessees, in their respective subleases, were given 60 days after sublease termination to remove their respective improvements. Sublease paragraph 4 provided that if a sublessee did not remove his improvements within the 60-day stipulated period "such improvements shall remain a part of the real estate."

The sublessees did not remove their improvements following the sublease termination date of July 6, 1970. Lessees Mortland asserted the right to possess and remove the sublease improvements in two written notices to sublessees. One notice was dated May 28, 1970. The second was a 3-day notice dated September 8, 1970 "to vacate and surrender possession of [the leasehold] premises . . ." Some sublessees paid lessees Mortland for a waiver of their claimed rights. The plaintiff sublessees did not comply with the 3-day notice. Lessees then took steps to remove one of the cabins from the subleased premises. The plaintiff sublessees

treated this action as the beginning of a sublease improvement removal program by the lessees.

The Stuchell and Anderson sublease groups thereupon brought separate actions, later consolidated, to enjoin lessees Mortland from removing the sublessees' improvements, to determine that lessees had no right to remove such improvements, and for other relief. Lessees Mortland contested the sublessees' claim for injunctive relief, claimed $5,000 in damages for alleged wrongful dispossession by the sublessees of the water distribution system theretofore erected by the lessees Mortland, and sought a determination by the court that they had the right to remove the sublessees' improvements and an award of damages resulting from the delay in removing the improvements. Other incidental relief claimed by the respective parties need not be discussed. Subsequently, the respective parties moved for summary judgment. They agreed that only law questions were involved, namely, the proper interpretation of the lease and sublease instruments. The court granted a summary judgment in the sublessees' favor and denied the summary judgment requested by the lessees Mortland.[2] Lessees Mortland appeal.

It is helpful at this point to set out and then analyze the following paragraphs of the lease of October 1, 1944, namely:

The Lessees and their assigns have the right and privilege to plat and sublease any portion of the above described premises; build and maintain roads; build power lines; drill or dig wells and install a water distribution system; install septic tanks, and/or sewerage system, all of a permanent nature to the value of $7,500.00. Appraisal of the said improvements to be made on such date or dates as the Lessees and Lessors may designate.

On such date or dates it is agreed by the parties that

[2]Lessees in a supplemental brief on appeal rely upon a portion of the record in a companion case in which the plaintiffs here are not parties. We are confined, however, to the record made below in this case. *American Universal Ins. Co. v. Ranson,* 59 Wn.2d 811, 370 P.2d 867 (1962); *Swak v. Department of Labor & Indus.,* 40 Wn.2d 51, 240 P.2d 560 (1952); *Large v. Shively,* 186 Wash. 490, 58 P.2d 808 (1936).

each shall select a competent appraiser and said two appraisers shall select a third appraiser to ascertain the above valuation. But if the two appraisers shall fail to agree on a third appraiser, then the Officer in charge of the Tulalip Indian Agency shall select the third appraiser. The appraisers shall proceed to determine the fair value of said improvements, and any valuation to be agreed upon by the majority of said appraisers, shall be accepted by both parties to this lease.

All other improvements, including buildings, etc., owned by the Lessees, in excess of the $7,500.00 shall remain the property of the Lessees at the expiration of this lease, unless otherwise provided, SUBJECT TO THE CONDITION, that no improvements or buildings of the Lessees shall be removed or disposed of, unless and until all the rents have been paid.

. . .

The Lessees may remove or dispose of all buildings and other fixtures placed upon the land by them at the expiration of this lease after the $7,500.00 improvement valuation has been ascertained and designated as the property to remain on the premises for the benefit of the lessors. If said buildings, fixtures, etc., of the Lessees are not removed or disposed of within 120 days after the expiration of this lease, through no fault of the Indian lessors, the title thereto shall vest in the United States in trust for the said Indian Lessors.

. . .

The Lessees hereby agree that at the termination of this lease, by normal expiration or otherwise, they will peaceably and without legal process deliver up the possession of said land, exclusive of the Improvements made and placed on the land by the Lessees and their sub-lessees, which remain their property, unless said Lessees fail to remove the same through no fault of the Lessors within the specified 120 days.

The lease appendix, which is part of the lease, also provides:

It is further understood and agreed by the parties to the foregoing Lease, that no improvements, however, shall be removed or disposed of by the Lessees which would in any way damage or destroy the usefulness of the buildings and improvements or other fixtures which

are to remain on the land and which under the terms of this Lease become the property of the Lessors . . .

The quoted lease provisions contemplated the creation of a successful recreational land development involving lessees with substantial management and improvement responsibilities and a number of sublessees who were to provide rental income to the lessees over a 25-year term. It was contemplated also that upon lease and sublease termination from whatever cause, the lessor Indian heirs of Charley Farmer, or their successors in interest, would receive back the leased premises with improvements thereon that would permit continuance of what was apparently contemplated as a successful operation. Accordingly, the lease required the lessees to install roads, wells, a water distribution system, septic tanks and/or sewerage system, "all of a permanent nature to the value of $7,500.00." Other improvements "owned by" the lessees not specified were permitted but not required. Upon lease termination, the removal or disposition by the lessees of improvements was prohibited if such removal "would in any way damage or destroy the usefulness of the . . . improvements . . . which are to remain on the land and which under the terms of this Lease become the property of the Lessors . . ."

The lease is not entirely clear concerning what is meant by the phrase "to the value of $7,500.00" when it deals with the mandatory improvements to be installed by the lessees. In light of the apparent intention to create a successful recreational land development adequately improved for that purpose, the phrase could mean that the permanent improvements were to have a value of not less than $7,500 as verified by appraisal. On this interpretation, no mandatory improvement, regardless of value, was to be removed. *See Greenville v. Washington Am. League Baseball Club,* 205 S.C. 495, 32 S.E.2d 777 (1945); 3 G. Thompson, *Real Property* § 1141, at 545 (1959 repl. ed); 51C C.J.S. *Landlord & Tenant* § 394(4), at 1025 (1968). On the other hand, the quoted phrase could mean that the lessees' obligation to

install permanent improvements ceased when the $7,500 valuation was reached and appraisal would be required to ascertain and designate what improvements belonged to the lessors and what improvements "placed upon the land by them" were subject to removal by lessees. The record fails to show that any appraisal called for in the lease was ever made, so that there is no showing that the water distribution system belonged to the lessees entitling them to complain of dispossession. *See Nelson v. Nelson Neal Lumber Co.*, 171 Wash. 55, 17 P.2d 626 (1932); 89 C.J.S. *Trover & Conversion* § 72 (1955).

The lease required lessees Mortland at lease expiration to peaceably surrender possession of the premises

exclusive of the Improvements made and placed on the land by the Lessees and their sub-lessees, which remain their property, unless said Lessees fail to remove the same through no fault of the Lessors within the specified 120 days.

The lease also provided:

If said buildings, fixtures, etc., of the Lessees are not removed or disposed of within 120 days after the expiration of this lease, through no fault of the Indian lessors, the title thereto shall vest in the United States in trust for the said Indian Lessors.

The lease permitted lessees Mortland to plat and sublease the leased premises. The lease did not, however, specify the nature or content of any sublease provision dealing with the sublessees' improvements or removal rights. Subject to any prohibition in the lease, lessees could require, permit, or partially or entirely prohibit sublease improvements. They could likewise specify the nature and extent of the sublessee improvement removal rights during or upon expiration of the sublease term. They could provide what should happen to unremoved improvements after the time for removal by sublessees expired, *e.g.*, whether the improvements should then be subject to removal by sublessees, or should remain on the land for the benefit of the heirs of Charley Farmer, the lessors. They could consult lessees' own interests in the provisions they adopted. Les-

sees Mortland had entered into a major 25-year commit-ment with the possibility of lease renewals of both the Charley Farmer premises and the tidelands premises. Such renewals could be profitable because of the possibility of recovering higher rents from the sublessees, especially if the sublease tracts had unremoved improvements thereon. The goodwill and cooperation of the Indians in the ensuing 25-year period was desirable and could be important to the lessees and to their prospective sublessees. Making provi-sion, therefore, that sublease improvements "shall remain a part of the real estate" would be a goodwill gesture of economic importance to help obtain any needed coopera-tion.

For whatever reason lessees may have had, however, lessees did not expressly provide in the sublease that they should have the right to remove unremoved sublessee im-provements. Instead, with no claim of mistake, they pro-vided in sublease paragraph 4 that sublessees were to have

sixty (60) days after the termination of this present lease within which to remove any of the structures placed thereon . . . ; but, in the event [sub]lessees fail to remove the same within such time, all such improve-ments shall remain a part of the real estate.

The quoted language chosen by lessees Mortland, if in-tended to create or preserve in the lessees the right to remove the sublessees' improvements, would have been most roundabout, as well as inapt for that purpose. The language unambiguously states that the sublessee improve-ments, after the expiration of the 60-day period, "shall remain a part of the real estate." The quoted language meant, or could reasonably be understood to mean, that the unremoved improvements which were to "remain" as part of the real estate would belong to the fee owners, namely, the heirs of Charley Farmer, or their successors in interest.

Lessees Mortland contend the sole purpose and function of the quoted language was to set at rest any question there might be whether the unremoved improve-ments were real or personal property. No doubt in other

contexts this might be true. So far as concerns lessees' removal rights under its lease here, however, such a determination is immaterial. Lessees Mortland in effect concede as much. They claim that whether or not sublessee improvements are part of the real estate, they still have the right to remove them by virtue of their lease. It is appropriate in this connection to call attention to the common-law rule that permanent improvements installed on leased premises by a lessee during the lease term are not removable by the lessee at lease expiration[3] in the absence of a provision to the contrary therefor.[4] The absence of a contrary provision which might have been inserted emphasizes the nonremovable character of the improvements involved. Here the sublease reserves no right in either the sublessee or the sublessors to remove sublease improvements after the 60-day period expires. Furthermore, we find no such right of removal reserved in the lease. The failure of the sublease to reserve the right of removal in face of the common-law rule requiring it hinders rather than helps lessees in their attempt to successfully assert the right of removal by them claimed.

██ In any case, the quoted language in paragraph 4 is at least ambiguous. It is capable of meaning that the unremoved sublessee improvements should "remain a part of the real estate" for the benefit of the heirs of Charley Farmer and their successors in interest. It is familiar law that any ambiguity in the meaning of a lease provision drawn by a lessor should be construed against him and in favor of the lessee because the lessor could have drawn the lease in such a way as to make his intention clear. *Puget*

---

[3] G. Thompson, *Real Property* § 1141, at 544 (1959 repl. ed.); 35 Am. Jur. 2d *Fixtures* § 2 (1967); 51C C.J.S. *Landlord & Tenant* § 394(4) (1968).

[4] A removal agreement in the lease, to the extent inconsistent therewith, supersedes the common-law rule dealing with lessees' improvement removal rights. *Forman v. Columbia Theater Co.*, 20 Wn.2d 685, 148 P.2d 951 (1944). *See generally* 1 G. Thompson, *Real Property* § 78, at 351 (1964 repl. ed.); 35 Am. Jur. 2d *Fixtures* § 22 (1967); 36A C.J.S. *Fixtures* § 15 (1961).

*Inv. Co. v. Wenck,* 36 Wn.2d 817, 221 P.2d 459, 20 A.L.R.2d 1320 (1950). *See generally* 49 Am. Jur. 2d *Landlord and Tenant* § 143 (1970); 36A C.J.S. *Fixtures* § 15(c), at 634-35 (1961).

It is true the lessees are required by the lease to peaceably surrender possession of the lease premises,

> exclusive of the Improvements made and placed on the land by the Lessees and their sub-lessees, *which remain their property,* unless said Lessees fail to remove the same through no fault of the Lessors within the specified 120 days.

(Italics ours.) By virtue of sublease paragraph 4, however, after the expiration of the sublease 60-day period, the sublease improvements no longer remain the property of the sublessees, nor are they the property of the lessees. Such improvements "remain a part of the real estate" and, as we have interpreted the phrase, remain for the benefit of the heirs of Charley Farmer or their successors in interest.

We agree with the trial court that lessees Mortland failed to show that they were the owners entitled to possession of the water distribution system. Whether this conclusion turns on the permanent character of the system, or whether it turns on the fact that there has been no appraisal so that the system can be "ascertained and designated" as the property of the lessees Mortland, the result is the same. We likewise agree, for the reasons stated, that the language of sublease paragraph 4 makes untenable lessees Mortland's position that they had a right to remove the unremoved sublease improvements after the 60-day period for such removal by the sublessees had expired.

Sublessees have urged reasons additional to those discussed to support the summary judgment entered. They argue, for example, that the sublease of a tract for the balance of the lease term in law constitutes an assignment pro tanto of the lease and leaves the lessees with no estate to which to annex a right to reenter save to "enforce a substantial advantage of the Mortlands in either collecting the stipulated subrental or enjoying the adjoining retained

premises." They argue that neither reason is applicable here. Sublessees particularly rely on *State v. Meador,* 60 Wn.2d 543, 374 P.2d 546 (1962). The conclusions here reached make it unnecessary to consider the additional reasons advanced.

The judgment is affirmed.

WILLIAMS and CALLOW, JJ., concur.