**PAULINA LAKE HISTORIC CABIN OWNERS ASSOCIATION, an Oregon corporation, Elmo and Betty Dryden, L. Willard Jarrell, Scott S. Abdon, Kenneth and Letta Mae Slusher, Richard L. and Yvonne Hubbard, Hubbard Drapery Company, Inc., Valentine Schaaf, Edward D. Moore, Palmer Brykit, Merle Jackson, Walter L. and Patricia Kincaid, Arvin Trapans, Diane W. Spies, and Michael Jay Rune, Plaintiffs,**

v.

**U.S.D.A. FOREST SERVICE, Ronald J. McCormick, and David G. Mohla, Defendants.**

**Civ. No. 82–869–PA.**

United States District Court,
D. Oregon.

Oct. 13, 1983.

Michael Jay Rune, Spies and Rune, P.C., Portland, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Arno Reifenberg, Sp. Asst. U.S. Atty., Portland, Or., for defendants.

PANNER, District Judge.

Plaintiffs are the Paulina Lake Historic Cabin Owners Association ("Association"), the Hubbard Drapery Company, and 17 named individuals. Defendants are the United States Department of Agriculture Forest Service ("Forest Service") and two Forest Service employees. Plaintiffs seek to enjoin defendants from interfering with their use of cabins, a lodge building, and other structures located on the edge of Paulina Lake in Oregon's Deschutes National Forest. They seek damages and other relief as well. I hold for defendants.

BACKGROUND

The parties have agreed to many of the facts underlying this dispute, *see* Stipulation of Facts (Sept. 15, 1983) ("Stipulation of Facts"), and this section is drawn largely from that stipulation.

In 1934, the Deschutes National Forest granted to the Bend, Oregon lodge of the International Order of Odd Fellows ("I.O. O.F.") a special use permit to build upon and occupy a 5.39 acre parcel of land on the forest (the "site"). Permittees built 11 cabins, a lodge, outbuildings, and campground structures ("structures").

Such a special use permit can be granted for no more than 30 years. *See* 16 U.S. C.A. § 497 (1974). For approximately the past 20 years, the Forest Service has been attempting to change the use on this site. The following quotation is from a 1962 Forest Service Inspection Report:

> In view of the many requests for organization campsites and the relatively high priority given to this type of recreation, steps should be taken to terminate the summer home use being made of this area. Require that the I.O.O.F. make their camp available for organization use throughout the summer. If this is not done, then serve notice that the permit will be terminated; but allow ample time for the organization to sell their improvements to a bona fide organization.

In November, 1963, the Deschutes National Forest replied to this recommendation as follows:

> The I.O.O.F. are not in a position to make their camp available for other group organization use. All of the houses are rented to individual I.O.O.F. members, and in some instances we believe, individuals own the improvements .... Our plan at this time is to terminate the permit to the I.O.O.F., but we must have more information before taking direct action. We believe this problem can be resolved early in 1964.

In November, 1967, the Forest Service's Region 6 office wrote to the supervisor of the Deschutes National Forest ("supervisor") that the I.O.O.F. camp should not be

converted to individual residence permits. In June, 1969, the regional office informed the supervisor that the permittee could be told that the use would terminate at the end of 1979. A new, ten-year special use permit, No. 218, was issued to the Bend I.O.O.F. on December 29, 1969. In October, 1970, the permit was superseded by a special use permit issued to the I.O.O.F. Grand Lodge of Oregon, with an expiration date of December 29, 1979 (the "permit").

In 1978 and 1979, several of the plaintiffs filed special use applications for cabins on the site. The Forest Supervisor denied these applications; the Regional Forester upheld the denial; the Chief of the Forest Service sustained that decision; and the Assistant Secretary of Agriculture declined to review the Chief's decision. No judicial review was sought.

In 1980 and 1981, the Forest Service wrote to the Grand Lodge and its attorney requesting removal of the structures and indicating that as of June 1, 1981, any structures or personal property remaining would become Government property.

In April, 1981, under prodding by the cabin owners, the Forest Service applied to the Keeper of the National Register of Historic Places ("Register") for a determination of eligibility of the I.O.O.F. camp for placement on the Register. The supervisor indicated he would postpone removing the structures until the Keeper acted. In November, 1981, the Keeper decided the property was ineligible. The Forest Service established the new date of July 10, 1982 for removal of the structures.

On July 9, 1982, plaintiffs filed this action requesting a preliminary injunction. I heard their motion on July 23rd. Shortly thereafter, the parties were able to settle the case with a stipulation which I approved. *See* Stipulation (Aug. 13, 1982) ("Stipulation").

The Stipulation provided the plaintiffs would apply to have the structures placed on the Register. Until then, plaintiffs could retain the use of the structures and the Forest Service would protect them. *See id.,* ¶¶ 4–5. The parties also agreed that if the decision of the Keeper was imminent, this case could be reinstated immediately.

No structures or personal property had been removed from the site by June 1, 1983, but in view of the snow conditions the Forest Service gave plaintiffs an extension to July 1, 1983. The structures were not removed. On July 7, 1983, Forest Service personnel nailed signs to each of the structures which read in part, "Property of the United States Government."

On July 13, 1983, plaintiffs moved to reinstate this action. On July 14, the Paulina Lake cabins were listed on the Register. On August 3, I granted the motion to reinstate and set a trial date of September 30.

## DISCUSSION

Plaintiffs' action rests mainly on section 106 of the National Historic Preservation Act of 1966 ("NHPA"), Pub.L. No. 89–665, 80 Stat. 915, 917, as amended, 16 U.S.C.A. § 470f (1983). That section creates a mechanism to promote the Congressional policy that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life . . . ." 16 U.S.C.A. § 470(b). The mechanism is a command to federal agencies to consider the effect of their actions on registered historic resources:

> The head of any Federal agency having . . . jurisdiction over a proposed Federal . . . undertaking . . . shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C.A. § 470f.

Plaintiffs contend that this provision and the Forest Service's past forbearance from eviction have given rise to an

implied license for plaintiffs to continue to use and enjoy the site until the Forest Service has complied with NHPA.[1]

■ In *United States v. 162.20 Acres of Land,* 639 F.2d 299 (5th Cir.), *cert. denied,* 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981), the Army Corps of Engineers sought to condemn property listed on the Register and eventually establish recreational facilities there to enhance a reservoir project. Defendant landowners appealed the district court's decision that their defense to the taking based on alleged governmental noncompliance with NHPA was legally insufficient. The Fifth Circuit affirmed. The court declared that "[t]he filing of a [condemnation] declaration, by which title vests, is a neutral act vis-a-vis NHPA compliance procedures and the policy concerns behind them. Federal agencies are compelled to abide by the terms of the NHPA regardless of the public or private character of the property involved." *Id.* at 304. The court went on to state that "[w]hile it may seem that the asserted defense would promote the purposes of the NHPA by creating a means of enforcement to give it 'teeth,' it is manifestly apparent that only Congress can make such a judgment." *Id.* (footnote omitted). *See also United States ex rel. T.V.A. v. Three Tracts of Land,* 415 F.Supp. 586, 588 (E.D. Tenn.1976) (NHPA no defense in condemnation action). *Cf. United States v. Mullins,* Civ. No. 82–6356–C (D.Or. Oct. 5, 1983) (Juba, J.) (National Environmental Policy Act no defense in condemnation action).

The Ninth Circuit has not ruled on NHPA's effect, if any, on condemnation

---

1. In closing argument the plaintiffs contended that the final decision whether to raze the structures rests with the Keeper, and defendants contended the final decision rests with the Forest Service. Plaintiffs have cited no authority in support of their position. A review of the cases suggests defendants are correct. For example, in *Benton Franklin Riverfront Trwy. Comm. v. Lewis,* 529 F.Supp. 101 (E.D.Wash.1981), *aff'd in part, rev'd in part,* 701 F.2d 784 (9th Cir.1983), the district court upheld the Secretary of Transportation's decision to demolish a bridge which has been declared eligible for inclusion on the Register. (The provisions of 16 U.S.C.A. § 470f apply both to structures on the Register and to those eligible for listing. *See* 16 U.S.C.A. § 470f (1983), reflecting 1976 amendment by Pub.L. No. 94–422, Title II, § 201(3), 90 Stat. 1320.) The court regarded section 4(f) of the Department of Transportation Act, 49 U.S.C.A. § 1653(f), as providing greater protection than NHPA, but concluded that the Secretary of Transportation had properly decided there were no prudent alternatives to demolition of the bridge. The court's reference to NHPA was simply to note that 16 U.S.C.A. § 470f "requires federal agencies proposing to affect objects eligible for Register inclusion to afford the Advisory Council on Historic Preservation reasonable opportunity to comment." 529 F.Supp. at 103. There was no suggestion the Keeper could override the Secretary's determination. Although the Ninth Circuit reversed, it did so on grounds which do not disturb this aspect of the district court's decision.

In *Evans v. Train,* 460 F.Supp. 237 (S.D.Ohio 1978), plaintiffs sought to enjoin federal funding of a sewage treatment facility which would al-

legedly adversely effect three Indian mounds listed on the Register. The court denied the defendants' motion for summary judgment but in its review of the applicable NHPA regulations gave no suggestion that federal agencies were required to do more than consult with historic preservation officials in the search for feasible and prudent alternatives to the proposed agency action. *Id.* at 245–46. Specifically, the court ruled there was a material issue of fact as to whether the agency had properly determined the proposed action would not adversely affect historic resources. The regulations require consultation only where the effect of an undertaking is adverse. 36 C.F.R. § 800.4(d). In such a case, the agency must suspend its action until the consultation has occurred. 36 C.F.R. § 800.-4(e). Plaintiffs have identified no regulation, and I have found none, which gives the Keeper a veto of the agency's ultimate decision.

The court in *Central Oklahoma Preservation Alliance v. Oklahoma City Urban Renewal Authority,* 471 F.Supp. 68 (W.D.Okla.1979), concluded that a unilateral decision by the Keeper that a building was eligible for inclusion on the Register would not even trigger the consultation requirements of the Act. *Id.* at 79–81.

The answer to plaintiffs' contention is summed up quite directly in this statement by the court in *Commonwealth of Pennsylvania v. Morton,* 381 F.Supp. 293 (D.C.D.C.1974):

The Secretary [of the Interior] substantially complied with 16 U.S.C. § 407f when he referred the Agreement to the Advisory Council [on Historic Preservation] for its comments. If he deviated from its recommendation, the Secretary was authorized to do so by the express terms of the statute.

*Id.* at 299.

proceedings. The Fifth Circuit reasoning appears sound, however, and Judge Juba in this district has relied on it in his very recent findings and recommendation in *Mullins, supra. See id.,* op. at 3.

In the absence of any authority to the contrary, I conclude that "transfer of title is an environmentally neutral action," *United States v. 162.20 Acres of Land,* 639 F.2d at 304, and that NHPA does not provide "a legal shield of protection" against a proper federal action to transfer or reclaim title. *Id.* Defendants' actions in asserting ownership of the structures are not an NHPA "undertaking." *See* 36 C.F.R. § 800.2(c) (1982).

The next question is whether the Forest Service acted properly in impounding the structures on July 7, 1983.

The Secretary of Agriculture has been empowered by Congress to promulgate "such rules and regulations as he deems necessary to prevent trespasses and otherwise regulate the use and occupancy of [national forest] property . . . ." 7 U.S.C.A. § 1011(f) (1980). The Secretary has issued the following regulation:

> (a) Automobiles or other vehicles . . . and other inanimate personal property on National Forest System lands without the authorization of a Forest officer which are not removed therefrom within the prescribed period after a warning notice as provided in this regulation may be impounded by a Forest officer. Whenever such Forest officer knows the name and address of the owner, such impoundment may be effected at any time five days after the date that written

> notice of the trespass is mailed by registered mail or delivered to such owner.

> (b) In the event the local Forest officer does not know the name and address of the owner, impoundment may be effected at any time 15 days after the date a notice of intention to impound the property in trespass is first published in a local newspaper and posted at the county courthouse and in one or more local post offices. A copy of this notice shall also be posted in at least one place on the property or in proximity thereto.

> (c) Personal property impounded under this regulation may be disposed of at the expiration of 90-days after the date of impoundment. The owner may redeem the personal property within the 90-day period by submitting proof of ownership and paying all expenses . . . .

36 C.F.R. § 262.4 (1982).

The parties have stipulated that the Forest Service did not know the names and addresses of the parties claiming ownership in the structures at Paulina Lake with the exception of the three plaintiffs named in the original complaint. Stipulation of Facts, No. 26 (Sept. 21, 1983). They have stipulated also that the Forest Service did not publish, in any newspaper or other media, notice of impoundment of the structures. Stipulation of Facts, No. 19.

■ Plaintiffs have a two-pronged argument. They contend the Forest Service violated its regulations in impounding their property. They also argue the Forest Service violated the Fifth Amendment prohibition on taking of property without due process.[2] Both contentions turn on whether

---

**2.** Plaintiffs do not allege they should be compensated for the Forest Service's failure to renew their *permit.* Nor would such an allegation be well-taken. The law is settled that special use permits create no vested property rights. *See, e.g., United States v. Fuller,* 409 U.S. 488, 492–93, 93 S.Ct. 801, 804–05, 35 L.Ed.2d 16 (1973) (on governmental taking of private grazing land, Fifth Amendment required no compensation for any value added to land taken by revocable permits to graze adjacent federal lands, although permits enhanced value of land taken); *United States v. 5.96 Acres of Land,* 593 F.2d 884, 888–89 (9th Cir.1979) (revocable per-

mit to build structures in river held mere license and not vested property right subject to just compensation); *Acton v. United States,* 401 F.2d 896 (9th Cir.1968), *cert. denied,* 393 U.S. 1121, 89 S.Ct. 1003, 22 L.Ed.2d 128 (1969) (Fifth Amendment does not require government to compensate for revoking mineral prospecting permit). Nor do plaintiffs contend here that they should be compensated for a taking of the *structures.* Such a claim, as they recognize, belongs in the United States Claims Court. *See* 28 U.S.C.A. § 1491. Rather, plaintiffs allege their Fifth Amendment *due process* (rather than "just compensation") rights have been violated

the structures belonged to plaintiffs or the Government immediately prior to the July 7, 1983 impoundment.

■ The rule at common law was that "all buildings become a part of the freehold as soon as they are placed upon the soil ...." *Kutter v. Smith*, 69 U.S. (2 Wall.) 491, 497, 17 L.Ed. 830 (1864). A District of Columbia Circuit case has held that this policy is so strong that despite the clear language of a lease that a building would become the lessor's property at the *termination* of the lease, the ownership by the lessor would attach as soon as the building was erected. *Hebrew Home v. District of Columbia*, 142 F.2d 573, 574 (D.C.Cir. 1944).[3]

The modern rule is that the intention of the parties controls. *See, e.g., Gourley v. O'Donnell*, 51 Or.App. 477, 626 P.2d 367, 371 (1981); *Lilenquist v. Pitchford's, Inc.*, 269 Or. 339, 525 P.2d 93, 95 (1974); *Shields v. Dept. of Revenue*, 266 Or. 461, 513 P.2d 784, 789 (1973); *United States v. City of Columbus*, 180 F.Supp. 775, 777 (S.D.Ohio 1959); *City of Philadelphia v. Straub*, 106 F.2d 172, 173 (3rd Cir.1939). *But see Fenlon v. Jaffe*, 553 S.W.2d 422, 429 (Tex.Civ. App.1977). The common law's influence may still be seen, however, in the modern presumption that in the absence of an agreement to the contrary any buildings erected by a tenant become the property of the landlord at the termination of the lease. *Shields*, 513 P.2d at 789. Parties may agree, of course, that any improvements erected by the tenant will remain the property of the tenant and be removable by him. *Id.*

■ Where parties have agreed that at the expiration of a lease improvements made by the tenant become property of the landlord, and the lease is lawfully terminated prior to expiration, the tenant forfeits any interest in the improvements absent equitable considerations directing a con-

trary result. *Gourley*, 626 P.2d at 371. Forfeiture of removal rights does not occur by a tenant choosing to pursue claims in court. *State v. Volk*, 611 S.W.2d 255, 257–58 (Mo.App.1980); *Lilenquist*, 525 P.2d at 99.

■ Where tenant has a right of removal, the right must be exercised within a reasonable period of time. *See, e.g., Tilchin v. Boucher*, 328 Mich. 355, 43 N.W.2d 885, 886 (1950) (cabins used in a summer camp were removable within a reasonable time after termination of the lease provided removal could be accomplished without injury to the freehold). In general, what is a reasonable time depends on the facts of the particular case. *See Coleman v. Owens*, 254 S.W.2d 341, 342 (Ky.1953); *Clark v. Talmadge*, 23 Cal.App.2d 703, 74 P.2d 825, 827 (1937); *Davidson v. Crump Mfg. Co.*, 99 Mich. 501, 58 N.W. 475, 476 (1894). For example, the reasonableness of a period may depend on the seasonal weather. *Tilchin*, 43 N.W.2d at 886–87. Where the parties specify a reasonable period for removal after expiration of the lease, the lessee does not have the right to remove improvements after the time has lapsed. *See Stuchell v. Mortland*, 8 Wash.App. 884, 509 P.2d 770, 776 (1973); *Bender v. Louisiana & Arkansas Ry. Co.*, 255 So.2d 849 (La.App.1971); *Salem v. Haggart*, 189 So.2d 283 (La.App.1966).

■ The special use permit issued the I.O.O.F. Grand Lodge provided in clause 12 that, upon termination, the permittee would remove all structures and improvements within a reasonable time period. Clause 38 provided:

> This permit is issued with the understanding and on the condition that unless sooner terminated or revoked for cause, it will expire on December 31, 1979, and all structures and improvements, except those owned by the United States, shall be removed in accordance with Clause 12

---

by the Forest Service's July 7, 1983 posting of signs. Plaintiffs claim damages of $10.00 per sign or a total of $120.00.

3. The explanation for the decision may lie in the fact that the lessor was claiming a tax exemption for a charitable building and exemptions from taxation are strictly construed against the taxpayer. 142 F.2d at 574.

of this permit. For the purpose of this permit, twelve (12) months after termination of the permit will be considered a reasonable period in which to remove the structures and improvements. This termination date may not be extended.

Clause 12 also provided that "if the permittee fails to remove all such structures or improvements within a reasonable period, they shall become the property of the United States, but that will not relieve the permittee of liability for the cost of their removal and the restoration of the site." (emphasis added).

Reading clauses 12 and 38 together, the permit's clear language provided that title to the structures would transfer to the Government on December 31, 1980.[1] My inquiry is whether anything prevented the agreement of the parties from being effectuated. That is, did forbearance by the Forest Service delay the effective date of vesting and, if so, did it delay vesting to a date later than July 7, 1983? Alternatively, has any law or regulation delayed vesting?

I am impressed that the language of clause 12 states that the fact that structures become property of the Government does not relieve the permittee of liability for the cost of their removal. This language lends considerable support to the defendants' argument that they did not evict the plaintiffs because it would be less expensive for the Government if plaintiffs would do the removal themselves. I am also impressed that the defendants' willingness to stipulate to continued use and occupancy of the site by the plaintiffs in August, 1982 demonstrated a spirit of cooperation rather than confrontation which should be commended in government officials. I cannot conclude that the Forest Service's forbearance delayed the title transfer past December 31, 1980. Even if vesting was delayed, it took place at the latest by July 1, 1983, the final date which

defendants imposed for removal of the structures. *Cf. Bay County v. Northeastern Michigan Fair Ass'n,* 296 Mich. 634, 296 N.W. 707, 710–11 (1941) (where county leased land to fair association for ten years under lease providing that association would build grandstand which would become property of county at expiration of lease, county became owner and was entitled to insurance proceeds on fire loss even though caretaker employed by association remained in charge of premises after lease expired).

I have already concluded that NHPA imposes no obstacle to the transfer of title. *Supra,* at 1192.

■ Plaintiffs argue that defendants must comply with the impoundment regulations, 36 C.F.R. 262.4 (1980), before a transfer of title may occur. Defendants argue that those regulations apply only to property which is not owned by the Government. That is self-evident. The Government does not impound its own property. But the Government is entitled to prevent trespass on its property. *See* 36 C.F.R. 261.10(e) (1982). I cannot conclude the impoundment regulations impose any obstacle to the transfer of title provided for in the permit.

The parties fairly can be said to have anticipated my decision. The Stipulation they entered last year provided:

4. Even though the permit has expired and the present users have no permit to occupy the site, plaintiffs may retain *use* of the structures on the site *until the determination has been made by the Keeper* of the National Register or June 1, 1983, whichever comes first. *Plaintiffs will remove their personal property from the site by that date.*

5. If the structures are placed on the National Register, the U.S. will follow the procedures outlined in 16 U.S.C. [§] 479 et seq. and 36 CFR Part 800. Until the final disposition of the structures has been determined in accordance with

---

**4.** The Government has the same right as does a private landowner to condition the grant of a license or easement on any lawful grounds, with the proviso that government actions "must rea-

sonably further a valid public purpose." *See United States v. 5.96 Acres of Land,* 593 F.2d at 890.

**1196**

these procedures, *the U.S. will protect the structures.*

6. If the structures are not placed on the National Register by June 1, 1983, plaintiffs will remove them immediately, but not later than June 15. *If plaintiffs do not remove the structures timely, they will pay the U.S. the reasonable cost of removal.*

Stipulation, ¶¶ 4–6 (emphasis added). The very strong language contained in the Stipulation illustrates that plaintiffs realized the relative weakness of their position and is contractually binding upon the parties.

■ Plaintiffs argue they are entitled to attorney's fees because the parties have stipulated that the site would not have been included on the Register, nor the structures preserved, absent their efforts. Stipulation of Facts, No. 22. The Act, as amended in 1980, provides for the award of attorney's fees to a prevailing party. 16 U.S.C.A. § 470w–4 (1983). *See WATCH v. Harris*, 535 F.Supp. 9 (D.Conn.1981).

Notwithstanding my decision that plaintiffs are not entitled to continued use and occupancy of the structures, I do conclude their efforts were the moving force behind inclusion of the Paulina Lake Cabins on the Register and that in that sense they are the prevailing party. Although the Forest Service stipulated to preserve the structures pending the Keeper's decision, it did so as a direct result of plaintiffs' filing of this action. Plaintiffs may file their petition in accordance with Local Rule 265–4.[5]

Plaintiffs request an injunction preventing any action by the Forest Service to move or destroy the structures without first complying with NHPA. The Forest Service has stipulated that it will so comply. Stipulation of Facts, No. 23; Stipulation, ¶ 5. An injunction is DENIED.

This opinion shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

IT IS SO ORDERED.

---

**5.** An award will only be given for expenditures of attorney time up to July 14, 1983, when the Keeper made his decision to list the site on the Register.