**Donald Richard YERGER,
Plaintiff–Appellant,**

v.

**F. Dale ROBERTSON, etc.; Dept.
of Agriculture, Defendants–
Appellees.**

**No. 91–16361.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1992.

Decided Dec. 15, 1992.

Gary Verburg, Margrave, Clemins & Verburg, Scottsdale, AZ, for plaintiff-appellant.

James C. Hair, Jr., Asst. U.S. Atty., Phoenix, AZ, for defendants-appellees.

Before: SNEED, ALARCON, and CANBY, Circuit Judges.

CANBY, Circuit Judge:

Donald Yerger appeals the district court's grant of summary judgment in favor of the government in a suit challenging the Forest Service's decision to deny a renewal of the use permit that authorized Yerger to run a recreational facility and food concession in the Prescott National Forest, Arizona. We affirm.[1]

## BACKGROUND

In 1981, Yerger received from the National Forest Service a special use permit for the operation of Horsethief Basin Resort in the Prescott National Forest. The resort lies in a mountainous pine forest region in Arizona. The trip to the resort from Phoenix requires approximately one-and-a-half hours of freeway driving and two hours of travel over thirty-two miles of rough gravel road. The last seven miles

---

**1.** The stay of the Forest Service's decision that we entered on October 19, 1992, is hereby vacated.

are particularly primitive and take thirty to forty-five minutes to traverse by car.

The resort was built in the late 1930's through a cooperative effort of the Forest Service and the City of Phoenix. At that time, air conditioning had not yet come into use and the resort was intended to provide a refuge from Phoenix's extreme summer heat, thereby promoting stability in the city's population and business environment. In 1966, the city relinquished its use permit for the resort and sold to the Forest Service the sewer and water systems that it had installed. Since then, five permittees have held special use permits for the resort; Yerger is the latest.

Yerger's permit provided that on termination, revocation or cancellation, Yerger was required to remove "within a reasonable time all structures and improvements except those owned by the United States, and [to] restore the site, unless otherwise agreed upon in writing...." The permit was for a period of five years and expired on December 31, 1986. The permit also required Yerger to maintain financial records of the resort's rental and retail businesses.

When the permit expired in 1986, the Forest Service extended it for an additional year in order to conduct a Needs Assessment and Future Use Determination Study to determine whether there existed a public need for the services that Yerger offered at the resort. Over the next few months, the Forest Service requested several times that Yerger provide complete records of the resort's accounts, as his use permit required. Yerger responded that he could not provide the information requested, but added that he believed that the occupancy rate had risen steadily for the last two years. As an example, he related that demand for cabin rentals had exceeded capacity on July Fourth and on the weekend of a horseshoeing contest in nearby Crown King.

In late 1987 the Forest Service completed the Future Use Determination Study. The study found that public demand for the resort was low and recommended that the Forest Service terminate Yerger's use permit. According to the study, because the resort was accessible exclusively via a winding and primitive one-lane dirt road, few travelers were willing to make the journey to Horsethief Basin. The study noted that those who did venture into the area were for the most part campers—who packed in the supplies they needed—and owners of vacation homes in the area. The study added that for the previous few years Yerger had failed to submit yearly financial records as required under his permit, but, relying on the anecdotal information about occupancy rates that Yerger had conveyed, the study concluded that public demand for the rental cabins was minimal. Finally, the study pointed out that the nearby community of Crown King provided the same services as the resort and was much more accessible to the public. Crown King, the study noted, was not located on National Forest land.

The Forest Supervisor notified Yerger that the agency would not renew his permit and Yerger appealed to the Regional Forester. On reviewing the record, the Regional Forester determined that he could not decide the case without a more thorough economic analysis of the need for the resort and the resort's profit potential. The Forester also raised *sua sponte* the question of whether the resort's structures fell within the scope of the National Historic Preservation Act, 16 U.S.C. § 470f, and directed the Supervisor to determine "whether the facilities meet the criteria for nomination to the National Register of Historic Places."

In reply, the Forest Supervisor submitted a second study in which he concluded once again that public demand for the resort was insufficient to justify renewing Yerger's permit. The second study compared Horsethief Basin Resort to other facilities in cool mountain areas that Phoenix residents use as a summer retreat. According to the study, three factors made Horsethief Basin Resort less suitable as a resort than similar facilities. First, because of the poor condition of the road leading into Horsethief Basin, the resort and adjacent camping facilities received very low use

except on summer holiday weekends. Second, the study found that occupancy rates at other facilities were significantly higher than those for resort. The study based these rates on the Forest Service's records of campground use and on a telephone survey of owners and operators of other facilities. Finally, the study cited Forest Service statistics on the average daily traffic between the resort and Crown King, which showed that traffic into Horsethief Basin was low. The study noted that much of the traffic was undoubtedly attributable not to the presence of the resort, but rather to the thirty-two summer homes and campground in the vicinity. In addition to the second study, the Forest Supervisor also submitted a letter stating that the agency had initiated National Historic Preservation Act compliance procedures and that "additional documentation might be required before the buildings could be removed if our original decision is affirmed."

The Regional Forester upheld the Forest Supervisor's decision to decline renewal of the permit. Yerger appealed to the Chief Forester, who, in the final agency decision on the matter, also affirmed the decision and issued an order granting Yerger a year to remove the structures and restore the site. The order provided, however, that "[c]ompliance with the National Historic Preservation Act is in progress, and completion of this process will be required before the structures may be impacted in any way." Yerger filed suit in federal district court, challenging the Forest Service's decision. The district court granted summary judgment in favor of the Forest Service.

## ISSUES

On appeal of the district court's decision, Yerger raises three issues. First, Yerger contends that the Forest Service's decision not to renew his use permit was arbitrary and capricious because it was based on inaccurate and conclusory findings. Second, Yerger asserts that the decision violates the National Historic Preservation Act, 16 U.S.C. § 470f, because the Forest Service had not completed compliance procedures at the time that it issued the order terminating Yerger's use permit and ordering him to remove the structures from the Horsethief Basin site. Finally, Yerger argues that the Forest Service should be estopped from refusing to renew his permit because when Yerger acquired the resort Forest Service personnel had assured him that the agency would renew his permit.

## DISCUSSION

### I. Findings in Support of the Decision Not to Renew

The Administrative Procedure Act, 5 U.S.C. § 706 (1977), authorizes us to set aside the Forest Service's action, findings and conclusions if they are arbitrary and capricious. An agency decision is arbitrary and capricious if, in reaching it, the agency failed to consider all relevant facts or to "articulate a satisfactory explanation for [the decision], including a 'rational connection between the facts found and the choice made.'" *Sierra Pac. Indus. v. Lyng*, 866 F.2d 1099, 1105 (9th Cir.1989) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)). Our review under the arbitrary and capricious standard is narrow: We "may not substitute [our] judgment for that of the agency." *Id.*

Under Forest Service guidelines, the agency may issue permits only to proposed uses that fulfill a public need and do not serve a function that can logically be provided on private lands. Forest Land Management Plan; Forest Service Manual § 2340.3. Forest Service regulations require the agency periodically to reevaluate public need for facilities operating under a permit. Forest Service Manual § 2703. If analysis reveals that a particular facility receives limited use, the agency must change or relocate the facility or terminate the permit. *Id.* Data demonstrating limited use may include records showing low use, low sales revenue and low fee payments. *Id.* When a use permit does not provide for renewal, the Forest Service officer charged with issuing the permit retains discretion to grant renewal. 36 C.F.R. § 251.64(b) (1992).

We find that the Forest Service's decision to terminate Yerger's lease was not arbitrary and capricious.[2] In both of the studies submitted to the Regional Forester, the Forest Supervisor cited ample and reliable data in support of the decision. The information available to the Forest Service indicates that the Horsethief Basin facility has collected low revenues since Yerger assumed operation of the resort. This finding, coupled with the facts that sufficient alternative facilities exist in nearby Crown King, and that, in comparison with other cool mountain retreats, the Horsethief Basin facility received minimal traffic and camping use, constitutes a satisfactory basis for the decision. *See Sierra Pac. Indus.*, 866 F.2d at 1105.

Yerger contends that the Forest Service's findings are unreliable because they are not based on statistics reflecting actual use of the resort. We reject Yerger's argument. Forest Service regulations do not limit the agency to actual use data in evaluating public demand. Forest Land Management Plan § 2703. Moreover, it was reasonable for the Forest Service to ground its decision on the available evidence when the lack of more complete evidence is Yerger's fault; Yerger is not to be rewarded for failing to comply with the conditions of his permit.

■ Yerger also challenges the Forest Service's reliance on information collected through the telephone survey of other resort operators. The administrative record contains letters from three resort operators who express doubt about the occupancy rate information that the Forest Service used in comparing public demand for Horsethief Basin Resort with their resorts. Even if the resort occupancy rate comparisons were unreliable, however, that fact would not lead us to conclude that Forest Service's decision is arbitrary and capricious. The campground use comparisons and the statistics on local traffic patterns constitute sufficient support, particularly in the light of the resort's minimal revenues, for the finding that public demand for the resort is low and that other facilities in the area can satisfy the public's need for the services that the resort provides.

■ Yerger disputes the Forest Service's conclusion that Horsethief Basin Resort could not be turned into a profitable commercial enterprise. Yerger introduced in the administrative record an accountant's analysis that indicated that a mere six percent occupancy rate was required for the resort to break even. Yerger also cites a letter in the record from the executive vice president of the Arizona Hotel and Motel Association stating that "[s]ome properties with small overhead would be profitable at a much lower occupancy." Admin.Rec. § I, ex. E. What Yerger fails to recognize is that commercial viability is only one indication of public need. As the Forest Supervisor explained in his responsive statement to Yerger's request for review, public need—not profitability—is the decisive factor in the Forest Service's decision. The Supervisor pointed out that the Forest Service could authorize many types of development that would be profitable commercial ventures, but those developments "would not necessarily fulfill a need for the users of the National Forest." Admin.Rec. Vol. II § 4, Ex.R at 8.

The government points out that Yerger does not dispute the Forest Service's finding of low use; rather, Yerger maintains that use is not an indication of public demand. According to Yerger, the low-use figure is attributable to the facts that the task of restoring the resort to commercial readiness has taken several years and that extremely poor road conditions prevent public access to the resort. The Forest Service has no plans, however, to improve the road leading into Horsethief Basin. To the extent that poor road conditions are a contributing factor, therefore, the use rates are unlikely to increase.

Finally, Yerger argues that the Forest Service's decision was made in· bad faith and constitutes arbitrary and capricious ac-

---

**2.** We discuss below the major contentions urged by Yerger. The remaining points that he has raised are clearly without merit.

tion. Yerger alleges that local Forest Service employees had decided before undertaking any analysis of public need to deny renewal of his permit and that the Forest Service proceedings were simply " 'post hoc' rationalizations." We reject Yerger's claim. As we have stated, the Forest Service's conclusion is supported by a satisfactory explanation and appears to have been made in consideration of all relevant facts. Forest Service officials at the regional and national levels reviewed and affirmed the local Forest Supervisor's decision.

II. The National Historic Preservation Act

■ Yerger contends that because the Forest Service had not completed the consultation process required under the National Historic Preservation Act, the decision violates the Act. Section 106 of the Act provides:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470v of this title a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f (1985).

Nothing in the language of the Act prevents the Forest Service from refusing to renew Yerger's permit prior to completing the mandatory consultation procedures. Indeed, the courts that have addressed the issue have held that the assumption of title or control over an eligible site is not a "federal undertaking" for the purposes of section 470f, because the mere exercise of ownership rights does not affect the historic character of the site, even when the assumption of control is clearly preparatory to action that will affect the site's historical aspects. *E.g., United States v. 162.20 Acres of Land,* 639 F.2d 299, 304 (5th Cir.), cert. denied, 454 U.S. 828, 102 S.Ct. 120, 70 L.Ed.2d 103 (1981); *Paulina Lake Cabin Owners Ass'n v. Department of Agric.,* 577 F.Supp. 1188, 1195 (D.Or.1983); *United States v. Three Tracts of Land,* 415 F.Supp. 586, 588 (E.D.Tenn.1976). The decision not to renew Yerger's use permit was nothing more than the reassumption of control over the Horsethief Basin site. *See Paulina Lake Cabin Owners,* 577 F.Supp. at 1195. The fact that the Forest Service issued its decision to terminate Yerger's permit before completing the consultation procedures required under the National Historic Preservation Act does not render the Forest Service's decision arbitrary and capricious.[3]

■ Yerger argues, however, that the other part of the Forest Service's order, the directive to remove the buildings from the site, would have an impact on the historic character of the resort and would clearly constitute a "federal undertaking" subject to the Act. 16 U.S.C. § 407f; 36 C.F.R. § 800.2(*o*) (1992). The Historic Preservation regulations state, however, that the Act does not bar agencies "from expending funds on or authorizing nondestructive planning activities preparatory to an undertaking *before* complying with [§ 407f, nor does the Act prohibit] phased compliance at different stages in planning." 36 C.F.R. § 800.3(c) (1992) (emphasis added). The Chief Forester's order provided that the buildings should not be removed until the consultation process was complete. Because the order is contingent on compliance, it comports with the requirements of the Act: The Forest Service did not fail to

---

**3.** For this reason, it was unnecessary for the district court to permit the Forest Service to supplement the record to show further compliance with the National Historic Preservation Act. Because we affirm on the original administrative record, we need not address the propriety of the district court's order permitting supplementation.

take into account the effect its decision would have on the historic character of the Horsethief Basin site. Nor, at the time Yerger initially raised his claim, did the Forest Service contend that it had completed the consultation process. We hold, therefore, that Yerger has failed to raise an issue under the National Historic Preservation Act that would cast any doubt on the validity of the Forest Service's decision not to renew his permit.

III. Equitable Estoppel

Yerger asserts that the Forest Service should be equitably estopped from refusing to renew his use permit because when he acquired the resort Forest Service employees assured him that the agency would renew his permit when the current term expired. Because the Forest Service failed to address this issue when it was raised during the administrative proceedings, we will review Yerger's claim *de novo*. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). A party seeking equitable estoppel against the government carries a heavy burden. In addition to the traditional elements of equitable estoppel,[4] the party must prove two additional elements: First, the party asserting estoppel "must establish 'affirmative conduct going beyond mere negligence.' " *S & M Inv. Co. v. Tahoe Regional Planning Agency*, 911 F.2d 324, 329 (9th Cir.1990) (quoting *Watkins*, 875 F.2d at 707, *cert. denied*, — U.S. —, 111 S.Ct. 963, 112 L.Ed.2d 1050 (1991)). Second, the party must prove that not applying estoppel would result in a serious injustice, and that the public will not be unduly burdened by the imposition of estoppel. *Id.; Wagner v. Director*, 847 F.2d 515, 519 (9th Cir.1988). Yerger has failed to allege that the Forest Service employees' assurances were affirmative acts that go beyond mere negligence. He does not attempt to prove that

in the absence of estoppel a serious injustice would result, or that the public would not be unduly burdened if we imposed estoppel in this case. We therefore reject Yerger's argument that the Forest Service should be equitably estopped from declining to renew Yerger's use permit.

AFFIRMED.

---

**4.** Under traditional estoppel principles, the party seeking estoppel is required to show that (1) the party to be estopped knew the true facts at the time the relevant conduct occurred; (2) the party to be estopped intended that the other party rely on his conduct or representation; (3) the party seeking estoppel was ignorant of the true facts; and (4) the party seeking estoppel did indeed rely to his detriment to the other's conduct. *Watkins v. United States Army*, 875 F.2d 699, 709 (9th Cir.1989) (en banc), *cert. denied*, — U.S. —, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990) (citations omitted).